PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1170
_____

DAWN GUIDOTTI, on behalf of herself and all
other class members similarly situated,

v.

LEGAL HELPERS DEBT RESOLUTION, L.L.C., a/k/a The
Law Firm of Macey, Aleman, Hyslip and Searns; ECLIPSE
SERVICING, INC., f/k/a Eclipse Financial, Inc.; GLOBAL
CLIENT SOLUTIONS, L.L.C.; LEGAL SERVICES
SUPPORT GROUP, L.L.C.; JG DEBT SOLUTIONS, L.L.C.;
ROCKY MOUNTAIN BANK AND TRUST OF
COLORADO SPRINGS, COLORADO; LYNCH
FINANCIAL SOLUTIONS, INC., trading as: Financial
Solutions Legal Center, Financial Solutions Consumer
Center, Financial Solutions Processing Center; JEM GROUP,
INC.; CENTURY MITIGATIONS, L.P.; LEGAL HELPERS,
P.C., trading as: The Law Firm of Macey and Aleman;
THOMAS G. MACEY; JEFFREY J. ALEMAN; JASON E.
SEARNS; JEFFREY HYSLIP; THOMAS M. NICELY;
JOEL GAVALAS; AMBER N. DUNCAN; HARRY
HEDAYA; DOUGLAS L. MCCLURE; MICHAEL
HENDRIX; JOHN DOE(S) 1-100; JIM DOE(S) 1-1000;
TOM DOE(S) 1-1000, the said names of John Doe(s), Jim

Doe(s) and Tim Doe(s) being fictitious; STEPHEN CHAYA;
RELIANT ACCOUNT MANAGEMENT, L.L.C.

GLOBAL CLIENT SOLUTIONS, L.L.C.;
ROCKY MOUNTAIN BANK AND TRUST
OF COLORADO SPRINGS, COLORADO,
Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 11-cv-1219)
District Judge:  Hon. Jerome B. Simandle
_____

Argued
March 5, 2013

Before:   SCIRICA, JORDAN, and ROTH, *Circuit Judges*.

(Filed: May 28, 2013)
_____

Shaji M. Eapen
Morgan Melhuish Abrutyn
651 W. Mount Pleasant Avenue - #200
Livingston, NJ   07039

Richard W. Epstein
Greenspoon Marder
200 E. Broward Blvd. - #1500
Ft. Lauderdale, FL  33301

John H. Pelzer   [ARGUED]
Greenspoon Marder
100 W. Cypress Creek Rd. - #700
Ft. Lauderdale, Fl   33309
    *Counsel for Appellants*

Joseph M. Pinto   [ARGUED]
Polino and Pinto
720 E. Main Street – Ste. 1C
Morrestown, NJ   08057
    *Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

JORDAN, *Circuit Judge*.

    Dawn Guidotti contracted with several parties to help her negotiate a settlement of her consumer debt.  When no settlement materialized, she filed this putative class action against them, claiming that she, and people like her, had been defrauded.  The United States District Court for the District of New Jersey granted a motion to compel arbitration as to the claims against most of the defendants, but it denied the motion as it pertained to Rocky Mountain Bank and Trust ("RMBT") and Global Client Solutions ("Global") (collectively, the "Appellants").  With respect to those two defendants, the Court held that the pleadings and certain evidence adduced by Guidotti were sufficient to demonstrate that there had been no meeting of the minds on an agreement to arbitrate and that Guidotti's claims against them were therefore not subject to arbitration.

Because we believe that the record before the District Court was insufficient to prove that there was no genuine dispute of material fact as to whether the Appellants and Guidotti agreed to arbitrate, we will vacate and remand the order denying arbitration. In explaining our reasoning, we hope to clarify the standards to be applied to motions to compel arbitration, identifying the circumstances under which district courts should apply the standard for a motion to dismiss, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure, and those under which they should apply the summary judgment standard found in Rule 56.

## I. Background

### A. *Facts*

Guidotti sued twenty-two defendants, alleging that they conspired to provide unlicensed debt adjustment services in violation of the New Jersey Debt Adjustment and Credit Counseling Act, N.J. Stat. Ann. § 17:16G-1, *et seq.*, the New Jersey RICO statute, N.J. Stat. Ann. § 2C:41-1, *et seq.*, the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*, and various common law principles. In short, she alleges that she was deceived into contracting with various defendants who led her to believe that they would convince her unsecured creditors to settle her consumer debts without her having to declare bankruptcy. Instead, she says, the defendants participated in a conspiracy to fleece her of her remaining assets without negotiating with or protecting her from her creditors. This appeal involves only two of the defendants, RMBT and Global. Through them, Guidotti opened a special bank account into which she automatically

4

deposited a monthly amount. Those funds were then supposedly to be used to pay the various defendants for their debt negotiation services, with the remaining funds to be used to pay a negotiated settlement. RMBT was the financial institution at which she opened the account, and Global was the processing agent that operated the automatic transfers into and out of the account.

To start at the beginning, however, Guidotti called defendant JG Debt Solutions in September 2009. She had accumulated approximately $19,550 in unsecured consumer debt, including credit card debt, and she wanted help in reducing or negotiating a settlement of her debt, as she hoped to ward off bankruptcy. She spoke with defendant Joel Gavalas, who described a "debt reduction program" through which her "credit card debt could be cut in half and paid off within three years." (App. at 96.) Gavalas explained that defendant Eclipse Servicing, Inc. ("Eclipse"), a debt negotiation company, would evaluate her finances to determine whether she "qualified" for the program, and that, if she did, a payment program would be prepared for her. (*Id.*)

After the initial call, Gavalas called Guidotti back and informed her that "she had been accepted in the program" and that Eclipse proposed two alternative plans for her. (*Id.*) He informed her that under either plan she would make monthly payments into a special bank account, and that the funds deposited into the account would pay for the debt settlement negotiation services and would also be used to settle her debts with her creditors. Guidotti chose a three-year plan pursuant to which she would pay approximately $358 per month. Gavalas also informed her that she would be represented in

5

the debt negotiation process by attorneys from defendant Legal Helpers Debt Resolution, LLC ("LHDR"), which calls itself a "national law firm" (*id.* at 333), and by Eclipse, the debt negotiation company with which LHDR works.

Later that same month, on September 29, 2009, Guidotti received an email from accounts@plansvc.com, an email domain associated with LHDR and Eclipse. The subject line of the email read "Debt Settlement Service Agreement," and it contained a link that led to various online documents maintained by a company called "DocuSign." (*Id.* at 332.) Included in the documents, Guidotti alleges, were two documents containing offers to form separate contracts: an attorney retainer agreement (the "ARA") and an application to open a Special Purpose Account with RMBT. The application for the Special Purpose Account was called, not surprisingly, the Special Purpose Account Application ("SPAA").

The ARA laid out the respective roles of LHDR and Eclipse in the debt settlement negotiation plan, stated the fee arrangements with LHDR and Eclipse, and limited the scope of the representation to be provided by LHDR to only "negotiat[ing] and attempt[ing] to enter into settlements with creditors of [Guidotti] in an effort to modify and/or restructure [Guidotti's] current unsecured debt." (*Id.* at 98.) The ARA also included an arbitration clause that provided, *inter alia,* that "[i]n the event of any claim or dispute between [Guidotti] and LHDR related to the Agreement or related to any performance of any services related to this Agreement, such claim or dispute shall be submitted to binding arbitration upon the request of either party upon the service of that request." (*Id.* at 193.) Finally, the ARA contained a

6

provision specifying that Guidotti agreed to establish an "authorized bank account" from which service fees, including legal fees, would automatically be withdrawn on a monthly basis, with the first payment to start on September 30, 2009, and out of which she would eventually pay her creditors following a negotiated settlement. (*Id.* at 191.)

In furtherance of that last provision of the ARA, the collection of documents also included the SPAA, which characterized itself as an "application" for that authorized bank account. (*Id.* at 195.) Once signed, the SPAA purported to memorialize Guidotti's agreement to permit RMBT, "through its agent Global, to initiate debit entries" from her primary checking account at TD Bank to the RMBT Special Purpose Account in the amount of $348.68 per month, "for the purpose of accumulating funds to repay [her] debts in connection with a debt management program … sponsored by [LHDR]." (*Id.*) The application also stated that Guidotti agreed that Global was authorized to "periodically disburse[ ] funds from the Account pursuant to instructions that [Guidotti] may give from time to time." (*Id.*) It also "authorize[d] payment from the Account of the fees and charges provided for in this Application and the Agreement." (*Id.*)

The SPAA included an acknowledgment and agreement that read:
> I understand that the Account's features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement [the "Account Agreement"] that accompanies this Application … . *I acknowledge that I have received a copy of the [Account Agreement];*

7

> *that I have read and understand it; that the [Account Agreement] is fully incorporated into this Application [the SPAA] by reference; and that I am bound by all of its terms and conditions.*

(*Id.* (emphasis in original).) According to the amended complaint, Guidotti signed and submitted the ARA and the SPAA on September 29, 2009.[1]

The SPAA referred to the Account Agreement nine times, but it gave no indication of what that agreement contained. Most particularly, for present purposes, the SPAA

---

[1] The documents contained in the record do not all corroborate Guidotti's assertion that she submitted the ARA and the SPAA on September 29, 2009. It is true that the email that purportedly conveyed a link to those documents is dated September 29, 2009, as is her version of the electronically signed ARA. But her version of the electronically signed SPAA is dated September 30, 2009. Those discrepancies are minor compared to the ones contained in the documents supplied by the Appellants. Their version of the ARA is dated September 22, 2009, and their two versions of the SPAA are dated September 22, 2009, and September 30, 2009. The Appellants did not provide any copy of the DocuSign email. Because no party has endeavored to explain these discrepancies, and given our conclusion that, under the circumstances here, a summary judgment standard of review applies to the Appellants' motion to compel arbitration, *see infra* Part II.B.2, we treat the chronology represented in Guidotti's amended complaint as accurate.

8

did not indicate that the Account Agreement had the following arbitration clause:

> In the event of a dispute or claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration in Tulsa Oklahoma utilizing a qualified independent arbitrator of Global's choosing. The decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction.

(*Id.* at 185.) The dispositive dispute before the District Court was whether the Account Agreement was included in the initial package of documents emailed to Guidotti in September 2009. The Appellants say that it was, but Guidotti contends that it was not provided to her until later, when she received it in the mail along with a "welcome" letter on October 19, 2009 (App. at 342), three weeks after opening the special bank account and depositing her first monthly payment. If the facts are as the Appellants claim, then presumably Guidotti had knowledge of and assented to the arbitration clause contained in the Account Agreement at the time she signed and submitted the SPAA. If her version is true, then she can credibly argue that she did not assent to arbitration and is not bound by that provision.

Guidotti's first payment to the Special Purpose Account was made on September 30, 2009. Over the course of the following 15 months, she deposited into the account a total of $5,626.97. After fees to LHDR and Eclipse were deducted, Guidotti was left with only $1,090.47 as of November 30, 2010.

9

During the fifteen months that Guidotti made the monthly payments, she did not pay anything on her credit cards or other debts, in accordance with what she says was her understanding of the debt settlement negotiation plan.[2] She received multiple calls and settlement offers from her creditors, all of which she forwarded to LHDR, expecting that they would address and negotiate a settlement of the accounts. None of her debts were settled, however, and she observed no negotiation efforts undertaken by LHDR or Eclipse.

Throughout 2010, Guidotti received increasingly dire communications from her creditors, eventually resulting in three of her four creditors suing to recover sums owed. When she requested LHDR's assistance with a suit for recovery filed by Target National Bank, Eclipse responded by noting that the ARA was not intended to cover defending Guidotti from suits, "but rather to manage and settle debts." (*Id.* at 101.) Guidotti's final payment to the Special Purpose Account was made by cashier's check in December 2010 because one of her creditors levied the remaining funds in her TD Bank checking account.

    B.    *Procedural History*

---

[2] In her amended complaint, Guidotti claimed that "[i]f the customer asked [defendant JG Debt Solutions] if they [sic] should make their minimum payments, they were told that if they did, it would interfere with the negotiation process and make it harder to negotiate." (App. at 110.)

Guidotti filed a putative class action in the Superior Court of New Jersey, Burlington County, on January 28, 2011. Defendant LHDR removed the action to the District Court on March 4, 2011, and Guidotti then filed the now operative pleading, her amended complaint, on March 17, 2011. Shortly thereafter, on March 23, 2011, thirteen of the twenty-two defendants, including the Appellants, filed two separate motions to compel arbitration, and the remaining defendants either filed motions to stay the action pending arbitration or later sought to join the motions to stay. On December 20, 2011, the District Court ordered the matter to be sent to arbitration, based on the motion filed by LHDR, Eclipse, and others, holding that the ARA's arbitration clause is "valid and enforceable." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 866 F. Supp. 2d 315, 329 (D.N.J. 2011).

The District Court did not, however, grant the motion to compel arbitration filed by RMBT and Global. In her response to that motion, Guidotti had attached copies of the SPAA, the ARA, and the Account Agreement. She noted that the SPAA and the ARA each contained headers bearing the name "DocuSign," indicating that they came from the DocuSign website linked to the email she had received. *Id.* at 333. In contrast, the Account Agreement did not bear a similar header, so Guidotti argued that it had not been provided to her in that September 29, 2009 email. *Id.*

Based on that evidence and also on the belief that the Appellants had, in four earlier cases from other jurisdictions, provided the Account Agreement to similarly situated plaintiffs only after those other plaintiffs had signed and submitted the SPAA, the District Court concluded that "the record is sufficient to establish that [Guidotti] did not receive

11

the [Account Agreement] in her initial collection of documents sent via e-mail … ." *Id.* Without requiring or permitting discovery on the matter, the Court held that Guidotti "d[id] not appear to have had knowledge of and assented to the incorporated terms." *Id.* 336 (internal quotation marks omitted).

The Appellants then sought our review of the denial of their motion to compel arbitration.

## II. Discussion[3]

[3] The District Court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Although, as the District Court acknowledged, complete diversity does not exist, *Guidotti*, 866 F. Supp. 2d at 321 n.1, complete diversity is not required under § 1332(d)(2) as long as, pertinent to this case, "the matter in controversy" is "a class action," the aggregate amount in controversy "exceeds the sum or value of $5,000,000," and "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Each of those requirements is met in this case.

The District Court also had jurisdiction to decide the motion to compel arbitration under the FAA, which provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil matter … of the subject matter of a suit arising out of the controversy between

12

A.     *Standard for Evaluating Motions to Compel Arbitration*

Because "[a]rbitration is a matter of contract between the parties," a judicial mandate to arbitrate must be predicated upon the parties' consent. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).   The Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*, enables the enforcement of a contract to arbitrate, but requires that a court shall be "satisfied that the making of the agreement for arbitration … is not in issue" before it orders arbitration.  *Id.* § 4.  "In the event that the making of the arbitration agreement is in issue, then 'the court shall proceed summarily to the trial' of that issue."  *Par-Knit Mills*, 636 F.2d at 54 (quoting 9 U.S.C. § 4).  "[T]he party who is contesting the making of the agreement has the right to have the issue presented to a jury."  *Id.*

Our precedents are not entirely clear on the standard for district courts to apply when determining whether, in a

---

the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

We have jurisdiction to review a district court's denial of a motion to compel arbitration under 9 U.S.C. § 16(1)(1)(B).  *See also Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 227-28 (3d Cir. 2012) (court of appeals has jurisdiction to review a district court order denying motion to compel arbitration even if the motion was denied without prejudice).

13

specific case, an agreement to arbitrate was actually reached. The issue typically arises when one of the parties files a motion to compel arbitration. Some of our cases "support the traditional practice of treating a motion to compel arbitration as a motion to dismiss for failure to state a claim upon which relief can be granted," under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 597 (3d Cir. 2004). We have also said, however, that "when considering a motion to compel arbitration … [a district court] should" employ "the standard used … in resolving summary judgment motions pursuant to [Rule 56 of the Federal Rules of Civil Procedure]." *Par-Knit Mills*, 636 F.2d at 54 & n.9; *see also Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009) ("A district court decides a motion to compel arbitration under the same standard it applies to a motion for summary judgment."). In this case, the District Court did not identify the standard it employed to analyze the Appellants' motion to compel arbitration. It simply said that, although there had been no discovery, the record was "sufficient to establish that [Guidotti] did not receive the [Account Agreement] in her initial collection of documents sent via e-mail," and that therefore there had been no agreement to arbitrate. *Guidotti*, 866 F. Supp. 2d at 333.

"We exercise plenary review over questions regarding the validity and enforceability of an agreement to arbitrate," *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010), and we are first obliged to determine which standard should have been applied, *cf. Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996) ("[W]e apply the same standard the district court should have applied in reviewing the arbitration award." (citation omitted)).

14

Answering that question is of utmost importance because the two standards differ in significant ways. The test in reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is whether, under any "plausible" reading of the pleadings, the plaintiff would be entitled to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We will affirm a district court's dismissal for failure to state a claim "only if, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint." *McGovern v. City of Phila.*, 554 F.3d 114, 115 (3d Cir. 2009). We "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Under Rule 56, by contrast, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asserting that there is a genuine dispute of material fact must support that assertion by "citing to particular parts of … the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Because summary judgment can be supported or

15

defeated by citing a developed record, courts must give the parties "adequate time for discovery." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In short, "[b]oth the burden on the non-moving party and the documents available to that party … differ significantly under the motion to dismiss and summary judgment standards." *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 479 (E.D. Pa. 2011).[4] Under the standard applied to a motion to dismiss, a "defendant need only shoulder a single burden – to show that the complaint fails to state a claim." *Id.* To combat the motion, the plaintiff typically "can rely only on the complaint and selected other documents." *Id.* Under a summary judgment standard, however, "a burden-shifting framework applies," *id.*, pursuant to which the moving party bears the initial burden of showing that the non-movant has failed to establish one or more essential elements of its case, and, once that initial burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A party opposing a motion for summary judgment has significantly more material at his disposal than when opposing a motion to dismiss, given that he may cite evidence gained during discovery.

---

[4] Much of our analysis here is drawn from the insightful opinion in *Somerset Consulting* written by the Honorable Stewart R. Dalzell of the United States District Court for the Eastern District of Pennsylvania.

16

Our inconsistent pronouncements on the applicable standard for evaluating motions to compel arbitration are perhaps explained by the competing purposes of the FAA, and by the values underlying contract interpretation. On one hand, the FAA places considerable emphasis on "efficient and speedy dispute resolution." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (remarking on "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts"). The Supreme Court has explained that, in pursuit of that goal, the FAA "calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983). On the other hand, speed is not the sole or even the dominant goal of the FAA. The Supreme Court has identified the "enforcement of private agreements," as another important aim, *Dean Witter*, 470 U.S. at 221, and it has "reject[ed] the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims," *id.* at 219.

The significant role courts play in interpreting the validity and scope of contract provisions applies an additional brake on the FAA's speed impulse. Although the FAA manifests "a congressional declaration of a liberal federal policy favoring arbitration agreements," *Moses H. Cone*, 460 U.S. at 24, "questions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination," *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir. 2012); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938,

17

944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." (alterations in original) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986))). Accordingly, "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Par-Knit Mills*, 636 F.2d at 54.

Viewed in light of those competing goals, our split pronouncements on the standard for deciding a motion to compel arbitration are reconcilable. "[W]here the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or … documents relied upon in the complaint)," *Somerset*, 832 F. Supp. 2d at 481, "the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery," *id.* at 482. That approach appropriately fosters the FAA's interest in speedy dispute resolution. In those circumstances, "[t]he question to be answered … becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis" for rejecting the affirmative defense. *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979).

In many cases, however, a more deliberate pace is required, in light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate. Thus, a Rule 12(b)(6) standard is inappropriate when either "the motion to compel arbitration does not have as its predicate a

complaint with the requisite clarity" to establish on its face that the parties agreed to arbitrate, *Somerset*, 832 F. Supp. 2d at 482, or the opposing party has come forth with reliable evidence that is more than a "naked assertion … that it did not intend to be bound" by the arbitration agreement, even though on the face of the pleadings it appears that it did. *Par-Knit Mills*, 636 F.2d at 55. Under the first scenario, arbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied pending further development of the factual record. The second scenario will come into play when the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue. At that point, the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard. *See id.* (judging motion to compel arbitration under summary judgment standard where plaintiff presented "[a]n unequivocal denial that the agreement had been made, accompanied by supporting affidavits").

Under either of those scenarios, a "restricted inquiry into factual issues" will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate, *Moses H. Cone*, 460 U.S. at 22, and the non-movant "must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity" of the arbitration agreement, *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 511 (7th Cir. 2003).[5] In such circumstances, Rule 56 furnishes the

---

[5] Pre-arbitration discovery has been held necessary in other contexts. In *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), the Supreme Court

"established the right of a claimant to invoke discovery procedures in the pre-arbitration proceeding in order to assist the claimant in meeting her burden of showing the likelihood [that arbitration will] bear[] prohibitive costs." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608-09 (3d Cir. 2002). "Arbitration costs are directly related to a litigant's ability to pursue [a] claim," *id.* at 605, because "'the existence of large arbitration costs could preclude a litigant … from effectively vindicating her federal statutory rights in the arbitral forum,'" *id.* (alteration in original) (quoting *Green Tree*, 531 U.S. at 90). The plaintiff in *Green Tree* had argued that she would be unable to vindicate her statutory rights in arbitration because "the arbitration agreement's silence with respect to costs and fees create[d] a 'risk' that she [would] be required to bear prohibitive arbitration costs if she pursue[d] her claims in an arbitral forum." *Green Tree*, 531 U.S. at 90. Discussing *Green Tree* in *Blair v. Scott Specialty Gases*, we stated that, "[a]lthough discovery is ordinarily not undertaken at such an early stage of a proceeding that is governed by an arbitration agreement, there is language in the Supreme Court's opinion faulting the claimant for not presenting evidence 'during discovery,'" *Blair*, 283 F.3d at 609 (quoting *Green Tree*, 531 U.S. at 92), and we noted that, during oral argument before it, "the Supreme Court assumed that discovery was available," *Id.* In *Blair*, the plaintiff argued that a fee-splitting provision in the arbitration agreement would similarly prevent her from vindicating her statutory rights. *Id.* at 605. The need for discovery in that context is apparent, we said, because, "[w]ithout some discovery, albeit limited to the narrow issue of the estimated costs of arbitration and the claimant's ability to pay, it is not clear how a claimant could present information on the costs of arbitration," or "how the

20

defendant could meet its burden to rebut the claimant's allegation that she cannot afford to share the cost." *Id.*

Pre-arbitration discovery has also been allowed to determine whether an arbitration clause is unconscionable. *See, e.g.*, *Parilla v. IAP Worldwide Servs., V.I., Inc.*, 368 F.3d 269, 284 (3d Cir. 2004) (remanding for "the development of a record" on whether the reasonably anticipated costs of arbitration and the plaintiff's financial situation would make arbitration prohibitively expensive, because "an arbitration provision that makes the arbitral forum prohibitively expensive for a weaker party is unconscionable"). In addition, it has commonly been allowed to determine whether an agreement to arbitrate has been formed. *See, e.g.*, *SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 272-73 (3d Cir. 2013) (holding that "additional discovery [was] warranted" on the issue of whether the plaintiff's board acted *ultra vires* when it signed an agreement containing an arbitration clause); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 511 (7th Cir. 2003) (holding that the defendant "must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of [the plaintiff's] signature" in arbitration agreement); *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 482 (4th Cir. 1999) ("Rule 81 [of the Federal Rules of Civil Procedure] … would authorize a district court, in enforcing an arbitration agreement, to 'order discovery pursuant to Fed. R. Civ. P. 26 on matters relevant to the existence of an arbitration agreement.'" (quoting *Champ v. Siegel Trading Co., Inc.*, 55 F.3d 269, 276 (7th Cir. 1995))); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) ("The FAA provides for discovery and a full trial in connection with a motion to compel arbitration only if 'the

21

correct standard for ensuring that arbitration is awarded only if there is "an express, unequivocal agreement to that effect." *Par-Knit Mills*, 636 F.2d at 54.[6]

---

making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'" (quoting 9 U.S.C. § 4)). Given that "[t]he burden of proving a generally applicable contract defense lies with the party challenging the contract provision," *Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 274 (3d Cir. 2004), the need for discovery in these types of situations is evident. Indeed, any time the court must make a finding to determine arbitrability, pre-arbitration discovery may be warranted. *See, e.g., Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 112 (3d Cir. 2000) (holding that "when the very existence of … an [arbitration] agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists").

[6] The conversion of the standard for reviewing a motion to compel arbitration mirrors the process provided by Rule 12(d) for converting a motion to dismiss to a motion for summary judgment. That rule provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Once the motion is converted to a motion for summary judgment, reasonable allowance must be made for the parties to obtain discovery. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) ("Such conversion is not appropriate where the parties have not had an opportunity for reasonable

To summarize, when it is apparent, based on "the face of a complaint, and documents relied upon in the complaint," that certain of a party's claims "are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Somerset*, 832 F. Supp. 2d at 482. But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." *Id.* After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard. In the event that summary judgment is not warranted because "the party opposing arbitration can demonstrate, by means of citations to the record," that there is "a genuine dispute as to the enforceability of the arbitration clause," the "court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Id.* (quoting 9 U.S.C. § 4).

B. *Application to This Case*

1. *Clarity of the Pleadings*

---

discovery."). Otherwise, weighing the new factual assertions against the facts pleaded in the complaint would "invite[] courts to consider facts and evidence that have not been tested in formal discovery." *Pfeil v. State St. Bank and Trust Co.*, 671 F.3d 585, 594 (6th Cir. 2012).

23

The Appellants contend that Guidotti's complaint was sufficiently clear to establish that she received, and agreed to the terms of, the Account Agreement when she signed the SPAA. They base that contention on language from the complaint itself and on the SPAA, which is a document cited extensively in the complaint. First, they argue that, by stating in her complaint that she received by email "a Special Purpose Account application [the SPAA], and account agreement establishing a Special Purpose Account" (App. at 97), Guidotti "affirmatively alleged," "[b]y the use of the comma, and the conjunction 'and' between the designation of the 'Special Purpose Account application' and the 'account agreement,'" that she received both the SPAA and the Account Agreement in the same email. (Appellants' Opening Br. at 15-16.) Second, they note that the SPAA, which Guidotti signed and submitted on September 29, 2009, states that the Special Purpose Account's "features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement that accompanies this Application." (App. at 183.) The next sentence provides (in italics and bold), "I acknowledge that I have received a copy of the [Account] Agreement; that I have read and understood it; that the [Account] Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions." (*Id.*) According to the Appellants, the SPAA is "a signed, contemporaneous document" that establishes that Guidotti received the Account Agreement at the same time as the SPAA, and that she therefore was cognizant of, and assented to, binding arbitration. (Appellants' Opening Br. at 14.) Thus, our first task is to determine whether the complaint and the SPAA, which is relied upon in the complaint, establish on their face that

24

Guidotti agreed to be bound by the terms of the Account Agreement, including its provision for arbitration, thereby triggering a Rule 12(b)(6) standard.

In that regard, the Appellants make a compelling case. It is true, as the District Court concluded, that Guidotti's "vague reference to 'agreement' in the Amended Complaint … does not clearly contradict" a finding that she was not emailed the Account Agreement, because "the sentence could be interpreted to mean that [Guidotti] was characterizing the 'Special Purpose Account' document as both an application and an agreement, which she signed and returned." *Guidotti*, 866 F. Supp. 2d at 333. But her signed acknowledgment of receipt of the Account Agreement and her acceptance of its terms is unequivocal. The signed SPAA states on its face that Guidotti "received a copy" of the Account Agreement, that she "read and understood it," and that she knew she was "bound by all of its terms and conditions." (App. at 183 (emphasis omitted).) Under the Rule 12(b)(6) standard, there would be no reading of the complaint, no matter how friendly to Guidotti, that could rightly relieve her of the arbitration provision in the Account Agreement, if the complaint were the only document in play. But it is not the only relevant document, and Guidotti's evidence cannot be ignored.

2. *Guidotti's Assertion That She Did Not Intend to Be Bound by the Terms of the Account Agreement*

Despite her signed acknowledgment, Guidotti asserts that in reality the Account Agreement was not supplied to her and she accordingly was unaware of its arbitration provision, until she received it in the mail on October 19, 2009, three

25

weeks after she had submitted the SPAA. She thus argues that she did not agree to, and cannot be bound by, the provisions of the Account Agreement, because she did not see them at the time she agreed to the contract and there was no meeting of the minds on the agreement to arbitrate.

The Appellants repeatedly insist that, in the words of *Par-Knit Mills*, Guidotti's denial in the face of the SPAA's acknowledgment of receipt of the Account Agreement is a mere "naked assertion" that she "did not intend to be bound by the terms" of the Account Agreement. *Par-Knit Mills*, 636 F.2d at 55. As such, they argue, it is "insufficient to place in issue the 'making of the arbitration agreement'" under the FAA, *id.*, and the District Court should have granted without further delay the motion to compel arbitration.

But contrary to the Appellants' emphatic position, Guidotti's denial is not entirely unsupported. Rather, she pointed out to the District Court, and has noted again on appeal, that the one-page SPAA and every page of the ARA, each supplied separately by her and the Appellants, have an encoded "DocuSign" header line, but that the Account Agreement, which was also provided by both sides, does not have it. From that evidence, she argues that the documents that contain the header – the ARA and the SPAA – were sent to her by email on September 29, 2009, with the intent that she would sign and return them, while the document that does not contain the header – the Account Agreement – was only later mailed to her on October 19, 2009. The question, then, is whether that evidence is sufficient to move the case beyond the pleadings and warrant the application of the summary judgment standard, with its accompanying call for discovery

and perhaps a limited trial if a genuine issue of material fact emerges.

To answer that, we look to *Par-Knit Mills*. The contract at issue in that case had "a space designated for signature entitled 'Buyer's Acceptance.'" *Par-Knit Mills*, 636 F.2d at 52. The documents also contained a paragraph "entitled 'Arbitration' [that] clearly stated, albeit in small print, that any claim arising out of the contract or the merchandise covered thereby shall be submitted to and determined by arbitration." *Id.* at 53. The parties "agree[d] that there had been no prior oral discussions or agreements regarding arbitration." *Id.* In addition, the plaintiff, Par-Knit Mills, admitted that one of its plant production managers signed the Buyer's Acceptance. *Id.* It asserted, however, that the production manager "signed the documents as confirmation only of the delivery dates contained therein, and that Par-Knit Mills never intended to bind itself to the clauses contained in the confirmations." *Id.* In other words, Par-Knit Mills "claim[ed] that there was never a 'meeting of the minds' on the terms and conditions contained in the confirmations and that absent such agreement, there can be no duty to arbitrate," notwithstanding the production manager's signature. *Id.*

As support, Par-Knit Mills argued that the production manager lacked the authority to execute contracts on behalf of the corporation and that the corporation therefore could not be bound by his signature, "no matter how clearly the document was labeled." *Id.* at 55. It also presented a sworn affidavit of the production manager asserting that it was not his intention to confirm all provisions of the contract, but merely to affirm the dates of delivery. *Id.* at 54. Under those circumstances,

27

we held, "it is for a jury and not the court" to determine whether the parties agreed to arbitrate. *Id.* at 55.

In so holding, we recognized that our ruling "may run contrary to the general policy of encouraging the arbitration of disputes," *id.*, and we contemplated the possibility of parties trying to dodge their obligations. For example, "[a] party may, in an effort to avoid arbitration, contend that it did not intend to enter into the agreement which contained an arbitration clause." *Id.* Such "[a] naked assertion … by a party to a contract that it did not intend to be bound by the terms [of an arbitration clause]," we reasoned, would be "insufficient to place in issue the 'making of the arbitration agreement'" for purposes of the FAA. *Id.* But we did not want to cut off legitimate disputes over an alleged agreement to arbitrate when there has been "[a]n unequivocal denial that the agreement had been made, accompanied by supporting affidavits … [;] in most cases [that] should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.'" *Id.* (citation omitted).

We find further support for that conclusion in *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009), a case in which we examined whether a lawyer had agreed to an arbitration provision contained in her firm's bylaws. She alleged in a sworn affidavit that she "was never provided with a copy of the By-Laws of defendant Firm," had "never signed any agreement or document which refers to or incorporates the arbitration provision in the By-Laws," and had "never agreed to arbitrate … claims against Firm." *Id.* at 159-60. Although the law firm did not "submit[] contradictory evidence showing that Kirleis had received the bylaws or had signed them," we noted that, even if it had,

28

"the task of weighing the evidence and choosing which side to believe would have been for a jury." *Id.* at 161-62 (citing *Par-Knit Mills*, 636 F.2d at 54). "Accordingly," we held, "Kirleis's allegations create a genuine issue of fact as to the existence of an agreement to arbitrate." *Id.* at 162.

It is true that, unlike the plaintiffs in *Par-Knit Mills* and *Kirleis*, Guidotti has not produced any affidavits to support her claim that she did not receive the Account Agreement until October 2009. Had she done so – had she sworn in an affidavit that she did not receive that agreement until three weeks after signing and returning the SPAA, for example – the facts of this case would be very similar to *Par-Knit Mills* and *Kirleis*, and we could more easily find that she had come forward with enough evidence to move beyond the pleadings and trigger the application of the summary judgment standard to determine whether there was a meeting of the minds on the agreement to arbitrate. But, even without an affidavit, the evidence concerning the DocuSign headers is not insubstantial. If Guidotti is correct that any document linked in the email that also linked to the SPAA would, like the SPAA, have a DocuSign header, then the fact that neither party has furnished a version of the Account Agreement bearing a DocuSign header is significant. We accordingly hold that Guidotti came forth with enough evidence in response to the Appellants' arbitration motion to trigger, pursuant to *Par-Knit Mills* and *Kirleis*, the summary judgment standard found in Rule 56 of the Federal Rules of Civil Procedure.

3. *Genuine Issue of Material Fact*

29

Although Guidotti's proffer of evidence placed in issue the parties' agreement to arbitrate, the District Court did not order discovery on the question, but instead "conclude[d]," on the very limited evidence before it, "that the record is sufficient to establish that [Guidotti] did not receive the [Account Agreement] in her initial collection of documents sent via e-mail." *Guidotti*, 866 F. Supp. 2d at 333. Stated differently, the Court held that, despite Guidotti's own signature on a document acknowledging receipt of the Account Agreement, the Appellants had not put forth enough evidence to establish even a genuine dispute of material fact on whether she had received that agreement and hence had notice of the arbitration clause. Instead, the Court summarily found that Guidotti had not received it until weeks after she had signed and returned the SPAA and thereby formed the contract.

The Court arrived at its conclusion for two reasons, it seems. First, it apparently accepted Guidotti's argument that the emailed documents contained a DocuSign header, but the Account Agreement did not, and that the implication of that difference was highly significant. Second, and perhaps most convincing to the Court, it found support for Guidotti's assertion in four cases from other jurisdictions in which the same parties who appear before us now as the Appellants purportedly provided customers with the same form of Account Agreement only after those customers had already signed the SPAA. Specifically, the Court cited *Carlsen v. Global Client Solutions, LLC*, 423 F. App'x 697 (9th Cir. 2011) (nonprecedential), *Davis v. Global Client Solutions, LLC*, 2011 WL 4738547, at *1 (W.D. Ky. Oct. 7, 2011) (unreported), *Webster v. Freedom Debt Relief, LLC*, No. 1:10CV1587, 2011 WL 3422872 (N.D. Ohio Aug. 4, 2011)

30

(unreported), and *Festa v. Capital One Bank*, ATL-L-4851-10 (N.J. Super. Ct. Law Div. Apr. 21, 2011) (unreported). Believing the factual circumstances of those cases to match Guidotti's assertion that she did not receive the Account Agreement until after she had already signed and submitted the SPAA, the District Court noted that "Defendants Global and RMBT seem to be accustomed to making this argument that the late-arriving conditions in the [Account Agreement] should bind the consumer, perhaps because they so frequently fail to send a copy of the [Account Agreement] until after the consumer/debtor has already committed to its terms via the incorporation clause in the SPAA." *Guidotti*, 866 F. Supp. 2d at 335 n.7. The Court even indicated that it could find that business practice "unconscionable" because, "based only on the cases cited by the Parties in this dispute, Plaintiff Guidotti appears to be the *fifth* customer so treated by these Defendants." *Id.* at 336 n.8.

Unlike the District Court, we are persuaded that a genuine issue of material fact remains regarding the agreement to arbitrate. We do not agree, in other words, that, based on her unsworn claim that the Account Agreement did not accompany the package of documents originally emailed to her in September 2009, and based further on the cases relied on by the District Court, Guidotti was entitled to summary judgment on the question of whether the parties had agreed to arbitrate.

Although it is true that neither side has come forth with a version of the Account Agreement that contains the DocuSign header, there has been no showing that all documents provided in the link included in the September 2009 email must necessarily contain the header. Said

31

differently, we have no way of knowing whether some of the documents provided in the email link could have borne the DocuSign header (the ARA and the SPAA, for example) while others did not (perhaps the Account Agreement). The headers certainly cast doubt on the proposition that the Account Agreement was included in the original email, but they do not establish that fact outright. Presumably, limited discovery regarding the email would have cleared up the issue – either the emailed link contained the Account Agreement or it did not – but given that no discovery has taken place, any summary conclusion is unwarranted.

In addition, the cases from other jurisdictions that involved the Appellants are less compelling in our view than they were to the District Court. Indeed, in two of those cases, the courts found that the customer *had* timely received the Account Agreement and granted the respective motions to compel arbitration. *See Davis*, 2011 WL 4738547, at *1 (holding that plaintiff had agreed to be bound by the terms of the Account Agreement by signing a second SPAA after receiving the Account Agreement); *Webster*, 2011 WL 3422872, at *2 (granting motion to compel arbitration and adopting the reports and recommendations of the magistrate judge, including a finding that the plaintiff received a copy of the Account Agreement with the SPAA).[7]

---

[7] In the other two cases, the courts did find that the Account Agreement was provided only after the contractual agreement had commenced with the signing of the SPAA. *See Carlsen v. Global Client Solutions, LLC*, 423 F. App'x 697, 698-99 (9th Cir. Mar. 21, 2011) (holding that plaintiffs had not agreed to arbitrate because the SPAA did not contain an arbitration clause and because the Account Agreement was

Thus, the District Court should not have denied the Appellants' motion to compel arbitration without first allowing limited discovery and then entertaining their motion under a summary judgment standard. If, after presentation of the evidence uncovered during discovery, a genuine dispute of material fact remained, the Court then should have submitted to a jury (if either party demanded one) the factual question of whether Guidotti was aware of the arbitration clause in the Account Agreement at the time she signed and submitted the SPAA.[8]

## III.  Conclusion

---

not available to the plaintiffs when they signed the SPAA); *Capital One Bank v. Festa*, C.A. No. ATL-L-4851-10 (N.J. Super. Ct. Law Div. Apr. 21, 2011) (finding that customer did not receive the Account Agreement until two weeks after signing the SPAA).

[8] In their briefing, the Appellants asserted in the alternative that "[e]ven if the [Account Agreement] was omitted from the package that was e-mailed to Guidotti" on September 29, 2009, the arbitration clause is still enforceable. (Appellants' Opening Br. at 16.) At oral argument, however, counsel for the Appellants stated that, if this Court were to vacate the District Court's order and remand for additional evidentiary development on the validity of the agreement to arbitrate, our review of those arguments would be "unnecessary." *See* Oral Argument at 30:30-31:00, *available at* http://www.ca3.uscourts.gov/oralargument/audio/12-1170Guidotti%20v%20Legal%20 Helpers%20Debt%20Resolution%20LLC%20et%20al.wma. We accordingly do not address those arguments here.

For the foregoing reasons we will vacate the District Court's order denying the Appellants' motion to compel arbitration and remand for proceedings consistent with this opinion.