FISHER, P.J.A.D.
*251 *264 The plaintiffs in these two actions claim they were victimized by the wrongful conduct[1] of defendant car dealers. Their sales contracts incorporated arbitration provisions which were enforced by motion in both cases. Because the record establishes the sales contracts, even if fully and mutually formed, were rescinded, and because plaintiffs' claims seem to mostly if not entirely relate to defendants' performance of the parties' agreements to rescind, which did not contain arbitration provisions, we reverse the orders dismissing these actions and remand.
*265 I
Soon after the filing of these two actions- Robinson v. Mall Chevrolet and Goffe v. Foulke Management Corporation-defendants moved to dismiss based on their contention that plaintiffs were contractually required to arbitrate the pleaded claims. The factual circumstances that we consider in reviewing the orders granting those motions appear in the complaints and the certifications filed in opposition to those motions.[2] Although the two cases present numerous similarities, we briefly discuss separately what occurred in each.
A
In opposing the motion to dismiss in her case, Sasha Robinson recounted her dealings with Mall Chevrolet. She asserted that on Saturday, November 5, 2016, she telephoned Mall Chevrolet to inquire about a vehicle; she was then told that if she made a purchase she would have two days to return the vehicle if she changed her mind. Robinson visited the showroom later that day and decided to purchase a 2016 Malibu. In consideration, Robinson agreed to pay $25,620 at the rate of $546 per month; as further consideration, she conveyed to Mall Chevrolet a vehicle she allegedly jointly owned with her mother, Tijuana Johnson. Robinson was also told that Johnson would be required to co-sign in order to complete the transaction.
At the same time, Robinson signed several documents for the purchase of the Malibu. One was a Motor Vehicle Retail Order Agreement (MVRO), which set forth the purchase price and information about the trade-in[3] ; the MVRO identified both Robinson *266 and Johnson as the purchasers and declared that the contract "shall not become binding until accepted by dealer or his authorized representative." According to Robinson, the dealer's representative had not signed the contract documents by the time she left the showroom with the *252 new vehicle. The MVRO also contained Robinson's "acknowledge[ment]" that she
RECEIVED, READ, UNDERST[OO]D AND ... SIGNED THE ARBITRATION AGREEMENT WHICH APPLIES TO THIS TRANSACTION.
Robinson signed the MVRO directly below this language.
The arbitration provision directed in bold print that Robinson
READ THIS ARBITRATION AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION.
The arbitration provision declared that both parties "have an absolute right to demand that any dispute be submitted to an arbitrator in accordance with this agreement" and that "[i]f either ... file[d] a lawsuit, counterclaim, or other action in a court, the other party has the absolute right to demand arbitration following the filing of such action." The document also expressed that both parties
are giving up the right to continue a lawsuit, counterclaim, or other action in court, including the right to a jury trial, in the event the other party exercises the right to demand arbitration pursuant to this agreement.
In addition, the document included a waiver of the right to trial by jury: "You and we expressly waive all right to pursue any legal action to seek damages or any other remedies in a court of law, including the right to a jury trial."
These provisions purported to encompass "all claims and disputes" between the parties and listed the covered disputes as including: any claims or disputes relating to the "purchase of any goods or services" from the seller; any "negotiations" between the parties; any claims relating to "this transaction"; all claims based on state and federal statutes, including CFA claims; "any claim or dispute based on an allegation of fraud or misrepresentation, including fraud in the inducement of this or any other agreement"; and any breach of contract claim. It asserted that claims "arising *267 out of, in connection with, or relating to ... whether the claim or dispute must be arbitrated," and claims regarding "the validity of this arbitration agreement," are to be submitted to arbitration.
Robinson signed but, according to her opposing certification, she was not given a copy of these documents. She paid a $1000 security deposit by debit card, turned over the traded-in vehicle, and left with the new Malibu. She was advised to return with her mother so she too could sign the sales contract; that never occurred.
Instead, on the following Monday, Robinson returned with Johnson and advised she was returning the Malibu because the cost was too exorbitant. Mall Chevrolet's representatives told Robinson she could not return the Malibu, that the representation about being able to rescind the deal within two days was a mistake, and that Robinson was bound by the documents she signed. Robinson claims Mall Chevrolet's representatives then attempted various coercive tactics to close the deal, including retaining the $1000 security deposit and the traded-in vehicle; they also offered to lower the monthly charges.
Mall Chevrolet eventually agreed to return the trade-in but initially refused to return the deposit, relenting only after Robinson and Johnson filed this lawsuit.
B
Like Robinson, Goffe also opposed a defense motion to compel arbitration by recounting the events that inspired her lawsuit. On October 7, 2016, she arrived at Cherry Hill Mitsubishi in response to an *253 internet advertisement for a 2013 Buick Verano, listed for $15,800. She discussed the matter with a sales representative, defendant Antonio Salisbury, who advised that financing-calling for $390 monthly payments and a $1000 down payment-was approved. Goffe was instructed to make a $250 payment that day, with the remainder due fourteen days later. The transaction also required a trade in of Goffe's vehicle. *268 Goffe signed several documents, including an MVRO and arbitration provision.[4] The documents are identical to those signed by Robinson that we quoted above. Goffe signed the documents in the same places as Robinson, thereby signaling that she read and understood the documents and, also, that she actually received copies. Like Robinson, Goffe's opposing certification asserts that she was not given copies of any documents she signed.
Goffe paid $250, canceled the insurance on her trade-in, and purchased insurance for the Buick. The dealership provided a temporary registration and Goffe drove the Buick off the lot.
Goffe returned to the dealership two weeks later with the remainder of the down payment. Salisbury then informed her that financing had not been approved and she could only retain the Buick if she agreed to make a $3000 down payment and commit to monthly payments of $400 instead of $390. Goffe refused and canceled the deal; the dealership returned the traded-in vehicle but did not immediately return Goffe's initial $250 down payment. She was only reimbursed after commencing this suit.
II
In similar oral decisions citing little more than "the policy in favor of arbitration," both motion judges determined the claims were arbitrable. They both entered orders of dismissal.[5]
Plaintiffs appeal and pose for our consideration essentially the same arguments: the sales contracts were contingent on events that never occurred and, therefore, should no longer bind the *269 parties; the sales contracts and their incorporated arbitration provisions are unconscionable and unenforceable because the process of extracting those agreements was barred by N.J.S.A. 56:8-2.22, which requires that copies of contracts be provided to consumers at the time of execution; and the orders should be reversed because of critical fact issues that should have been resolved in the manner suggested by Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 774-75 (3d Cir. 2013), which authorizes limited discovery and evidentiary hearings to resolve disputes about arbitrability in appropriate cases.
Mall Chevrolet cross-appeals in the Robinson matter, arguing that the judge erred in not dismissing Johnson's claims on standing grounds.
We permitted NAACP Camden County East's filing of amicus briefs and its participation at oral argument in both matters. Amicus's arguments chiefly address the effect of N.J.S.A. 56:8-2.22 in such matters.
*254 III
We first consider certain general federal principles that lurk over our consideration of the issues raised in plaintiffs' appeals.
A
The Federal Arbitration Act (FAA) creates a "body of federal substantive law" that-due to federal supremacy concepts-is "applicable in state and federal courts." Southland Corp. v. Keating, 465 U.S. 1, 12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). The FAA was enacted as a "response to widespread judicial hostility to arbitration agreements," AT & T Mobility LLC v. Concepcion, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), and represents "a congressional declaration of a liberal federal policy favoring arbitration agreements,"
*270 Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).[6]
This federal substantive law recognizes the "fundamental principle that arbitration is a matter of contract," Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010), a concept that logically leads to another: courts will not compel arbitration of disputes when parties "have not agreed to do so," Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ; Atalese, 219 N.J. at 442, 99 A.3d 306. Consequently, the FAA expressly authorizes courts to disregard arbitration provisions "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and courts are to compel arbitration only when "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," 9 U.S.C. § 4.
The policy that favors arbitration does not, however, exist in a vacuum. A party's claim that arbitration of a dispute is required is-we again emphasize-a matter influenced by contract law. Rent-A-Center, 561 U.S. at 67, 130 S.Ct. 2772. Parties must have agreed to arbitrate before a judge may compel them to arbitrate. Whether parties had a meeting of the minds on that subject, and whether a party, who has ostensibly agreed to waive the right to trial by jury, has clearly and unambiguously consented to arbitration will be influenced by state contract principles. Atalese, 219 N.J. at 442, 444, 99 A.3d 306. So, courts do not offend the federal policy favoring arbitration when applying state contract principles to determine whether interactions at the formative stage ripened into an enforceable contract or, if so, whether the parties later agreed to rescind their contract and, with it, its *271 incorporated arbitration provision. These circumstances are implicated here.
B
In considering the orders under review against the backdrop of these principles and in light of the documents these parties are claimed to have executed, we find no infirmity in the content of the arbitration provision or the manner in which that content was conveyed to these consumers.
In bold and conspicuous print, the provisions emphasize that, by fixing their signatures on defendants' documents, plaintiffs-and defendants too-agreed to arbitrate all related claims and waived their rights to trial by jury regardless of *255 the legal basis for the claim. We see nothing in the arbitration provisions in question that would run afoul of our decisional law's insistence upon a clear and conspicuous expression of that intent. See, e.g., Morgan v. Sanford Brown Inst., 225 N.J. 289, 307-09, 137 A.3d 1168 (2016) ; NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 428, 24 A.3d 777 (App. Div. 2011) ; Rockel v. Cherry Hill Dodge, 368 N.J. Super. 577, 579-81, 847 A.2d 621 (App. Div. 2004).[7]
Standing alone and without consideration for the surrounding events, we recognize that the particular arbitration provisions included within the parties' sales contracts are capable of being enforced.
*272 IV
The issues raised, however, cannot be decided solely by reference to the arbitration provisions, nor by reference to the "policy in favor of arbitration," upon which both trial judges relied with little additional analysis.[8] The circumstances surrounding the execution of the documents in question raise legitimate questions about the enforceability of defendants' otherwise acceptable arbitration provisions, namely: (a) whether, in Robinson, an enforceable sales contract was ever formed; (b) whether, in both cases, defendants complied with N.J.S.A. 56:8-2.22, and (c) whether-with the agreements to rescind reached by the parties in both cases-the arbitration provisions contained in the sales contracts were also rescinded.
In approaching these issues, we first observe that the trial judges in both cases ruled, with little additional analysis, that the arbitration provisions were enforceable because public policy favors arbitration. Because defendants sought summary dispositions of these questions, as well as the dismissal of the complaints, the judges were obligated to assume the truth of plaintiffs' allegations. Indep. Dairy Workers Union v. Milk Drivers Local 680, 23 N.J. 85, 89, 127 A.2d 869 (1956) ;
*256 Seidenberg v. Summit Bank, 348 N.J. Super. 243, 249-50, 791 A.2d 1068 (App. Div. 2002). And because *273 we agree with the Guidotti approach as a proper methodology for resolving similar arbitrability questions-for reasons we discuss later, see Section V(B) below-we conclude that the judge erred in dismissing these complaints for the purpose of resolving the pleaded disputes in arbitration.
A
We find in the Robinson record a genuine dispute as to whether the parties entered into an enforceable contract. Mall Chevrolet has consistently phrased both in the trial court and here-as if to concede their discussions with Robinson and the executed documents never ripened into a binding contract-that Robinson's disputes arise from her "attempt [ ] to purchase a vehicle" (emphasis added). In addition, although disputed, Robinson asserted that Mall Chevrolet required Johnson's participation as a co-signor-and it is undisputed that Johnson never signed. To be sure, Robinson gave Mall Chevrolet a cash deposit and her vehicle-which Robinson claims she jointly owned with her mother-and drove off with the Malibu, but the contract documents acknowledged that the act of taking possession of the new vehicle was "subject to" a number of terms, including approval of the financing aspects of the contract. If financing was not approved, the documents memorialized that Robinson retained the right to continue to possess the vehicle only if she paid the purchase price or obtained her own financing; absent that, Robinson was required to "surrender the vehicle." In short, even if Johnson's involvement in the transaction was not necessary or material-as defendant contends but Robinson disputes-Robinson retained the right to rescind the contract if financing was not approved. Because there were factual disputes about the need for Johnson's signature and because the contract appears to have made enforceability of the sales contract conditioned upon financing approval or some other agreement about payment that never occurred, arbitration could not be compelled absent factual findings that would favor Mall Chevrolet on those questions.
*274 So, unless we're going to let the tail wag the dog, if the parties never reached an enforceable sales contract, they could not be said to have agreed to arbitrate any disputes arising from that incomplete contractual relationship. At the very least, the Robinson judge was required to conduct an evidentiary hearing to resolve these obstacles to arbitration.
B
While the Robinson case has the added attraction noted above, both cases present another factual obstacle to arbitration.
Plaintiffs, as well as amicus, emphasize the potential impact of N.J.S.A. 56:8-2.22 on the arbitrability of plaintiffs' claims. That CFA provision makes it "an unlawful practice" for a party to a sales contract to request a consumer's signature on a document "as evidence or acknowledgement of the sales transaction" "unless" that party "shall at the same time provide the consumer with a full and accurate copy of the document so presented for signature." Ibid. Both Robinson and Goffe asserted in opposition to defendants' motions to compel arbitration that-despite what the contract documents actually state or purport to acknowledge-they were not given copies of the documents they signed. As a consequence, they argue the provisions of those sales contracts-including the arbitration provisions-are unconscionable and should not be enforced.
*257 Although the effect of a violation of N.J.S.A. 56:8-2.22 has not been considered in any reported decision,[9] we cannot imagine the Legislature imposed such a requirement without likewise anticipating a remedy for its violation. We conclude such a violation should be treated no differently than we have treated failures to provide written estimates as required by regulation. Although *275 in Scibek v. Longette, 339 N.J. Super. 72, 82, 770 A.2d 1242 (App. Div. 2001), we did not express a hard-and-fast rule that would address the failure of a seller to provide a written estimate as legally required[10] -a circumstance similar to that in question here-we did recognize that "the prophylactic value of the [CFA] to deter future violations would be diminished were we to discard" the brightline applied by the trial court in Huffmaster v. Robinson, 221 N.J. Super. 315, 322, 534 A.2d 435 (Law Div. 1986), which barred a seller's recovery for a violation of such a regulation.
We also reject the argument that this dispute itself is a matter for resolution by an arbitrator. To have an enforceable contract with an included enforceable arbitration provision, a seller-like defendants here-must provide to a consumer the contract documents they signed. Whether that did or didn't occur here is a question of disputed fact; those disputes in both cases must be resolved by the trial judges before arbitration may be enforced. Any other approach risks a possibility that a CFA violator might receive the benefit of the very contract extracted in violation of the CFA.
C
Both cases also question whether an arbitration provision may survive and govern disputes arising from the parties' dealings after they mutually agreed to rescind the very sales contract that contained an arbitration provision. Because the parties' dealings, which are similar in this regard, both culminated in agreements to rescind their sales contracts, we must consider whether disputes arising from their agreements to rescind must nevertheless be arbitrated.
*276 As a general matter, we conclude that arbitration of those later disputes cannot be compelled. By agreeing to return to square one-in legal terms, the status quo ante-defendants implicitly agreed to rescind all plaintiffs' obligations just as plaintiffs agreed to a rescission of all defendants' promises. As observed in one of the leading treatises, "[a]bsent evidence to the contrary, the legal effect of rescission is the discharge of all rights and duties on the part of both parties with respect to the contract that has been rescinded." Corbin on Contracts (2003), Vol. 13, § 67.8 at 49 (emphasis added); see also Williston on Contracts (4th ed. 2003), Vol. 29, § 73.15 at 49. Our Connecticut colleagues have held that when parties mutually agree to rescind a contract that contains an obligation to arbitrate they cannot be compelled to arbitrate questions arising from the agreement to rescind. Smith & Smith Bldg. Corp. v. DeLuca, 36 Conn.App. 839, 654 A.2d 368, 370 (1995). We agree. By mutually agreeing to rescind the sales contracts, the parties likewise agreed *258 to rescind the arbitration provision absent some manifest intention to retain that particular aspect of the rescinded agreement. See Gillette v. Cashion, 21 N.J. Super. 511, 516, 91 A.2d 421 (App. Div. 1952) (recognizing that once rescinded, a contract may be renewed only by express agreement or by conduct "evidencing such an intention"). Because defendants have offered no evidence to suggest that the agreement to arbitrate survived their mutual abandonment of the sales contracts, there can be no doubt that the arbitration provisions were discarded in the process just as the promise to pay for the vehicle or the promise to allow the plaintiffs to retain the vehicles upon a commitment to pay the purchase price were also discarded. The parties' factual contentions can only be interpreted as if the parties actually tore up their sales contracts and rescinded them in their entirety. As our Supreme Court recognized in County of Morris v. Fauver, 153 N.J. 80, 97, 707 A.2d 958 (1998), an agreement to rescind consumes the entire contract; in quoting Merickel v. Erickson Stores Corp., 255 Minn. 12, 95 N.W.2d 303, 306 (1959), the Court held that such a rescission means that "what *277 has been done is wholly undone and no contract provisions remain in force to bind either of the parties."
V
Having established how the scope of the sales contracts' arbitration provisions should be viewed in these circumstances, and having recognized the existence of certain relevant disputed questions of fact regarding the formation of the sales contracts, we turn to consider how those claims should be resolved, i.e., by arbitrators or by the trial courts. This first requires consideration of defendants' argument that the question of arbitrability should be decided in arbitration.
A
We are mindful that contractual questions may arise when a court is asked to consider whether parties agreed to allow an arbitrator to determine whether they agreed to arbitrate. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942-43, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (recognizing that just as "the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute," the question "who has the primary power to decide arbitrability turns upon what the parties agreed about that matter"). When analyzing whether the parties agreed to arbitrate the question of arbitrability, courts "should apply ordinary state-law principles that govern the formation of contracts" but courts also "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." Id. at 944, 115 S.Ct. 1920 (quoting AT & T Techs. v. Commcn's Workers of Am., 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ).
The question here, however, is broader. We have identified factual questions that must be decided before determining whether the parties entered into enforceable contracts that contained arbitration provisions. Only a finding that an enforceable sales contract was finally formed would give rise to the question whether *278 they agreed to arbitrate the arbitrability of the particular disputes arising from that contract. It would defy logic to conclude only an arbitrator may determine whether contracts with arbitration provisions were ever formed or only an arbitrator may determine whether-when there was no dispute that the contracts containing the arbitration provisions were rescinded-claims relating to the agreements to rescind must be arbitrated. And we see nothing *259 in the precedents that bind us to suggest otherwise.
Rent-A-Center enforced as written a particular contractual provision that clearly delegated the authority to determine arbitrability to an arbitrator; that determination, however, rendered arbitrable questions about the "validity" of the contract. 561 U.S. at 72, 130 S.Ct. 2772. That decision does not hold that questions about whether a contract was even formed must also be arbitrated; the Court recognized that there was no dispute in the matter before it "whether any agreement between the parties 'was ever concluded.' " Id. at 70 n.2, 130 S.Ct. 2772. On the other hand, our Supreme Court recognized in Morgan that "whether the parties formed a contract-that is, whether the parties concluded an agreement"-was not an issue to be arbitrated despite the presence of a delegation clause. 225 N.J. at 306, 137 A.3d 1168. We conclude that the factual disputes that must be resolved before it might be said that the parties "formed" or "concluded" the contract containing the so-called delegation provisions-such as the circumstances relating to the impact of Johnson's unwillingness to sign off on Robinson's contract with Mall Chevrolet and the failure of both dealers to provide Goffe and Robinson with copies of the signed documents-are not arbitrable. To hold otherwise, would give defendants full benefit of an aspect of a contract without first showing that the contract was ever fully "formed" or "concluded." Only if those factual disputes about formation are resolved by the trial courts in defendants' favor may those courts then consider whether any of those claims relating to the contracts of sale-as opposed to the agreements to rescind-are arbitrable.
*279 B
Having found the existence of roadblocks to arbitration that can only be resolved by the trial court, we turn to the question of how the trial courts should now proceed.
With these factual disputes that must be determined before ascertaining whether there are any arbitrable issues, the judges must permit limited discovery and, if necessary, evidentiary hearings. In Guidotti, 716 F.3d at 767, the plaintiff opposed a motion to compel arbitration, claiming that the full contract, with its incorporated arbitration clause, was not provided to her until after she signed the documents.[11] The court held that a "restricted inquiry into factual issues" was necessary to "properly evaluate whether there was a meeting of the minds on the agreement to arbitrate." Id. at 774 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 22, 103 S.Ct. 927 ). In other words, the court recognized that a motion to dismiss is inappropriate if the party invoking the arbitration provision fails to establish "on its face that the parties agreed to arbitrate," or if the opposing party has come forth with reliable evidence calling mutual assent into question that is more than a " 'naked assertion ... that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did." Id. at 774 (citation omitted). The second scenario comes into play "when the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue." Ibid. Under either scenario, "a 'restricted inquiry into factual issues' will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate," and the non-movant must have the opportunity *260 to conduct limited discovery. Ibid. (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 22, 103 S.Ct. 927 ). *280 The Guidotti holding is not limited to contract formation issues. "[A]ny time the court must make a finding to determine arbitrability, pre-arbitration discovery may be warranted." Id. at 775 n.5. Although our courts have yet to expressly adopt this approach, we conclude that it befits our jurisprudence and should be followed in like matters, such as these cases now before us.
The trial court's flexible powers also extend to conducting proceedings designed to separate arbitrable claims from nonarbitrable claims. Here, we sense the possibility that plaintiffs may have pleaded causes of action that would include arbitrable claims if the preliminary factual questions we have recognized are resolved in defendants' favor-in that they arise from the sales contract or the negotiations leading to the formation of those sales contracts-as well as claims that are not arbitrable, such as claims relating to defendants' performance of the agreements to rescind, i.e., after agreeing to rescind they nevertheless withheld some part of the consideration plaintiffs originally provided.
The complaints filed by Robinson and Goffe are similar in that they both allege all the operative facts-from the time they made contact with defendants until they were refused or delayed in receiving the consideration they previously provided-and then they both set forth the same six causes of action, see n.1, above, which each incorporate all the facts alleged at the outset. The trouble with that approach is that it inhibits the court's separation-if warranted-of claims that are arbitrable from those that are not. To the extent some of these claims are based on discussions or representations made during the contract-formation stage, they may very well be arbitrable. But, if there are claims included within plaintiffs' complaints that are based on defendants' conduct subsequent to the formation of the agreements to rescind, they are not.
Recently, in a similar circumstance, we recognized a trial court's authority to compel the filing of amended pleadings for the purpose of better ascertaining those claims that are arbitrable and those that are not.
*281 Greenbriar Oceanaire Cmty. Assoc., Inc. v. U.S. Home Corp., 452 N.J. Super. 340, 345-46, 173 A.3d 1103 (App. Div. 2017). The same approach may be taken here, or the courts might, consistent with Guidotti, call for limited discovery or an evidentiary hearing to ensure that the claims are litigated in the proper forum. We commend these procedures to the trial judges going forward.
VI
We turn lastly to Mall Chevrolet's cross-appeal, which focuses on Johnson's claims.
Johnson is in a unique position. She signed nothing and had no dealings with Mall Chevrolet. Because she did not agree to arbitrate, the Robinson judge erred in compelling her to arbitrate. Mall Chevrolet does not appear to argue to the contrary; indeed, in its merits brief, Mall Chevrolet expressed its "agree[ment]" that Johnson "did not sign the contract documents and was not a party to the contract including the arbitration agreement."
Mall Chevrolet argues, however, that-arbitrable or not-Johnson has no cognizable action, phrasing that contention in standing terms. Mall Chevrolet claims that the judge should have dismissed Johnson's claims on their merits. Although the judge dismissed the complaint, he did so only in the sense that the arbitration provision precluded Johnson's pursuit of her claims *261 in court; the judge did not express any view as to whether Johnson failed to assert a cognizable cause of action.
In considering this standing argument as it applies to Johnson's CFA claim,[12] we start with an understanding that standing to sue under the CFA is viewed "broadly in order to accomplish [the CFA's] remedial purpose, namely, to root out consumer fraud." Lemelledo, 150 N.J. at 264, 696 A.2d 546. An *282 actionable CFA claim requires that the claimant suffer "any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful" by the CFA. N.J.S.A. 56:8-19. This language, as our Supreme Court has observed, "unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action" and to have "standing under the Act." Weinberg v. Sprint Corp., 173 N.J. 233, 251, 801 A.2d 281 (2002).
It appears Johnson had no dealings with Mall Chevrolet, a fact that prohibited the order compelling arbitration of her claims but also raises concerns about whether she possesses a cognizable CFA claim. The CFA does not require "direct contractual privity between the consumer and the seller of the product or service," Port Liberte Homeowners Ass'n v. Sordoni Constr. Co., 393 N.J. Super. 492, 505, 924 A.2d 592 (App. Div. 2007), but it does require a "causal relationship ... between the ascertainable loss and the unlawful practice," Roberts v. Cowgill, 316 N.J. Super. 33, 41, 719 A.2d 668 (App. Div. 1998) ; see also Feinberg v. Red Bank Volvo, Inc., 331 N.J. Super. 506, 511, 752 A.2d 720 (App. Div. 2000), and requires proof that the loss was "actual," Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248, 872 A.2d 783 (2005). Normally, that loss may be viewed as having occurred "when a consumer receives less than what was promised," Romano v. Galaxy Toyota, 399 N.J. Super. 470, 479, 945 A.2d 49 (App. Div. 2008), but an "out-of-pocket loss or a demonstration of loss in value" will also suffice, Thiedemann, 183 N.J. at 248, 872 A.2d 783. In this spirit, we conclude that the wrongful detention of property may constitute an ascertainable loss so long as the damage is, in the words of Thiedemann, "quantifiable or measurable." Ibid.
Johnson claims she sustained ascertainable losses in two distinct ways. First, she asserts she was a co-owner of the vehicle Robinson traded in and that defendant's delay in returning that vehicle-once the parties agreed to rescind the sales contract-harmed her as well as Robinson. The value of that brief detention *283 [13] has not been shown, but the offering of such evidence at this stage would be premature. In our view, when faced with an immediate motion to compel arbitration, Johnson could not have been expected to offer evidence of the loss incurred when Mall Chevrolet delayed returning the vehicle. We are satisfied that, at this stage, it was enough to avoid dismissal for Johnson to allege that Mall Chevrolet wrongfully delayed returning the vehicle once Robinson and Mall Chevrolet agreed to rescind the sales contract. Although the alleged delay *262 in returning the vehicle may not have had a great value, it was not nothing.
The existing factual record casts serious doubt as to whether Johnson suffered any other ascertainable loss. She alludes to Mall Chevrolet's delay in returning the cash deposit, but that deposit was made by Robinson-as Johnson appears to concede by referring to it as "my daughter's deposit." But we need not draw any firm conclusion on this point. At this stage, in resolving the issues raised in the cross-appeal-that Johnson lacked standing and that her complaint should have been dismissed on its merits-it is enough to say that she has alleged an ascertainable loss without our need to determine whether all claimed ascertainable losses are legally sufficient.
For these reasons, the order compelling Johnson to arbitrate her claims cannot stand and the argument raised in Mall Chevrolet's cross-appeal that there are other reasons to dismiss Johnson's complaint are without merit.
VII
In summary, we reverse the dismissal orders in both matters and remand for further proceedings in conformity with this opinion.
*284 We also affirm the order denying Mall Chevrolet's motion to dismiss Johnson's complaint in the Robinson matter on the other grounds asserted by Mall Chevrolet in its cross-appeal.
For the reasons we have expressed, the trial courts need to make certain factual determinations before they would be empowered to compel arbitration of any aspect of these actions. When the dust settles, and if the judges determine there are both arbitrable and non-arbitrable claims to be adjudicated, they should determine the order in which the arbitrable and nonarbitrable claims should proceed or whether they should proceed simultaneously. Greenbriar Oceanaire, 452 N.J. Super. at 345-46, 173 A.3d 1103.
We reverse the orders under review in both matters and remand for proceedings in conformity with this opinion. And we do not retain jurisdiction.

Plaintiffs in both actions allege that defendants engaged in common-law fraud and also violated the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, the New Jersey Truth-in-Consumer Contract Warranty and Notice Act, N.J.S.A. 56:12-14 to -18, the New Jersey Plain Language Act, N.J.S.A. 56:12-1 to -13, and the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601 to 1667f.

In her suit and in her merits brief here, Goffe refers to prior difficulties Foulke may have had with the Attorney General. Not to be outdone, defendants allege plaintiff's representatives have engaged in unethical conduct. We will not participate in or mention further these ad hominem attacks.

According to these documents, the traded-in vehicle was valued at $5500 and Robinson was still obligated to pay $8605.59 on that vehicle; the net negative value of that vehicle was factored into the purchase price.

Cherry Hill Mitsubishi claims Goffe also signed a "Spot Delivery Agreement" which explained the transaction was contingent upon obtaining financing approval; Goffe disputes she signed such a document.

Contrary to N.J.S.A. 2A:24-4, neither judge stayed the actions pending arbitration but instead simply dismissed them. We assume there was some sort of stat-driven basis for entering orders of dismissal rather than orders staying the actions. In any event, the labels appended to those orders do not impact the manner in which they should be reviewed.

The "nearly identical" New Jersey Arbitration Act has also been recognized as favoring parties' arbitration agreements. Atalese v. U.S. Legal Servs. Grp., LP, 219 N.J. 430, 440, 99 A.3d 306 (2014).

Because our jurisprudence insists upon clarity in such circumstances, sellers have learned to disclose their attempt to obtain the consumer's agreement to arbitration without the deceptive approaches of the past. See, e.g., Tom Waits, Step Right Up (Asylum Records 1976) ("You got it buddy; the large print giveth, and the small print taketh away"). They undoubtedly are willing to more conspicuously extract such waivers from consumers because they have the backing of the Supreme Court of the United States which has exalted the FAA to a point that it tramples all highly valued state interests. See Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530, 533, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012) (holding that state law prohibiting arbitration provisions in nursing home contracts had no bearing on the enforcement of the FAA's policy in favor of arbitration).

Other public policies were certainly implicated by these contract documents. Plaintiffs' complaints assert consumer fraud violations, and the eradication of consumer fraud ranks high in the public interest. Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997). Indeed, that public interest is not a mere state interest, as consumer rights have also been championed by congressional enactments, such as the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601 to 1667f, upon which plaintiffs rely here. Arbitration agreements and orders that compel arbitration also eviscerate the cherished right to trial by jury-a right so revered that its deprivation was cited by the Declaration of Independence for our break from Great Britain. The federal arbitration jurisprudence that has been developed by the Supreme Court of the United States has exalted the FAA's policy in favor of arbitration over these many other important rights and substantial public interests. While we may disagree with the high Court's promotion of the importance of arbitration, we may not disregard the Court's precedents and we resolve the issues presented by fully applying the FAA's binding principles.

One unpublished opinion found it unnecessary to consider whether such a violation would render it unfair or inequitable to compel arbitration pursuant to the contract that had not been provided. In light of Rule 1:36-3, we do not cite that unpublished decision.

That limitation was based on a concern that this requirement could also be wielded as a sword and not just a shield, i.e., that a consumer might accept goods or services only to avoid payment through reliance on this requirement. Id. at 82, 770 A.2d 1242. That circumstance, however, is not presented here.

That particular issue is also raised here. See Section IV(B), above.

Mall Chevrolet has not argued why-even if we were to agree that Johnson cannot maintain a CFA claim-Johnson would not have standing to assert her other causes of action. Consequently, we decline to consider those claims at this stage.

There appears to be a factual dispute about whether or how long Mall Chevrolet delayed a return of the traded-in vehicle. Mall Chevrolet claims it was "immediately returned" but Robinson and Johnson dispute this without providing any further information about the length of the delay. We leave these questions for the future.