**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3177

CHARLES L. ADLER; GRANT ADLER;
CM ADLER, LLC,
                              Appellants

v.

GRUMA CORPORATION, DBA Mission
Foods; GUERRERO MEXICAN FOOD
PRODUCTS, Etc.

_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No. 3:22-cv-06598)
District Judge: Honorable Robert Kirsch

_____

Argued November 6, 2024

(Filed: April 16, 2025)

Before: KRAUSE, SCIRICA, and RENDELL, *Circuit Judges*.

Stephen J. Brown
David H. Chen
Susan E. Galvao
Bleakley Platt & Schmidt
One N Lexington Avenue
White Plains, NY 10601

Hannah M. Kieschnick [ARGUED]
Public Justice
475 14th Street
Suite 610
Oakland, CA 94612

Shelby H. Leighton
Public Justice
1620 L Street NW
Suite 630
Washington, DC 20036

*Counsel for Appellants*

Christopher B. Fontenelli
Richard J. Reibstein [ARGUED]
Troutman Pepper Locke
200 Vesey Street
Brookfield Place, 20th Floor
New York, NY 10281

*Counsel for Appellees*

_____

OPINION OF THE COURT

_____

RENDELL, *Circuit Judge*.

Plaintiffs Charles and Grant Adler, through their business entity, Plaintiff CM Adler LLC, distributed tortillas and other food products of Defendant Gruma Corporation to grocery stores in the central New Jersey area pursuant to a "Store Door Distributor Agreement" (SDDA). When Defendant terminated the relationship, Plaintiffs brought this lawsuit. The District Court dismissed the case, concluding that under the SDDA, Texas law governed and the case should proceed to arbitration.

Plaintiffs urge the District Court should have first considered the applicability of the Federal Arbitration Act (FAA) and conclude that it did not apply to their contract because it was a "contract[] of employment" and, as distributors, they belong to a "class of workers engaged in . . . interstate commerce." 9 U.S.C. § 1. Plaintiffs also dispute the District Court's decision to apply Texas rather than New Jersey law and raise objections to its interpretation of the contract as well as its decision to bind two non-signatories under an estoppel theory.

We agree with Plaintiffs that the District Court's choice-of-law analysis was flawed because it failed to consider the impact of three New Jersey public policies on its arbitrability ruling. Before considering that aspect of the District Court's ruling, however, and based on our opinion in *Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287 (3d Cir. 2021), we will address the applicability of the FAA. Because the record on that issue is fully developed, and the question it presents is a purely legal one, we can conclude on appeal that the FAA does not apply to the SDDA. We will then remand for the District Court to consider the arbitrability analysis anew under state

law. We will also instruct the District Court on remand to reevaluate, if necessary, whether the individual Plaintiffs, who did not sign the arbitration agreement, are bound by its terms.

## I.

Plaintiffs allege that in March 2014, CM Adler LLC entered into the SDDA with Defendant Gruma Corporation to distribute Defendant's tortillas and other food products to stores in Trenton and surrounding areas of central New Jersey. The SDDA was signed on behalf of CM Adler LLC by non-party Mary Adler. Plaintiffs Charles and Grant Adler, not themselves signatories to the contract, performed the LLC's work for the next eight years, until Defendant terminated Plaintiffs' distributorship "without cause" in June 2022. Appx 033, ¶ 10.

Plaintiffs then brought this lawsuit. They alleged Defendant's termination was retaliatory because Plaintiffs had begun organizing with other distributors to discuss their legal rights. Plaintiffs alleged that Defendant's actions violated state and federal labor laws, including failing to pay minimum wages and making unlawful deductions. They urged that their relationship was governed by these labor laws based on the degree of control Defendant exerted over Plaintiffs' day-to-day work. Plaintiffs also urged that the SDDA was in substance a "franchise" agreement subject to New Jersey's Franchise Practices Act, N.J. Stat. § 56:10-1 *et seq.*, and that, therefore, termination without cause was forbidden. Appx 069–072.

Defendant moved to dismiss and compel arbitration based on a provision in the SDDA, which stated that, with certain exceptions not relevant here:

4

[A]ll . . . claims and causes of action arising out of or relating to this Agreement (including, without limitation, matters relating to this Subsection 15(i) regarding arbitration, matters relating to performance, breach, interpretation, meaning, construction, or enforceability of all or any part of this Agreement, and all claims for rescission or fraud in the inducement of this Agreement) shall be resolved by arbitration through J·A·M·S/Endispute ("JAMS") as provided in Subsection 15(i)(iii) [sic] below.

Appx 096, § 15.i.ii.

Defendant's motion invoked both the FAA, 9 U.S.C. § 1 *et seq.*, and the Texas Arbitration Act (TAA), Tex. Civ. Prac. & Rem. Code, ch. 171. As support for the application of Texas law, Defendant pointed to the choice-of-law provision in the SDDA, which states:

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. The Federal Arbitration Act, 9 U.S.C. § 1 et seq. shall also apply as needed to uphold the validity or enforceability of the arbitration provisions of this Agreement.

Appx 098, § 15.k. Defendant also attached a declaration listing its contacts with Texas, including that Texas was the location of its headquarters and the state where it performed many of its business operations.

Plaintiffs opposed arbitration. They contended the FAA does not apply due to its exemption for "contracts of

5

employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Charles Adler submitted a declaration recounting Plaintiffs' transportation work, including "receiv[ing] shipments of Gruma product," "load[ing] the Gruma product on to . . . trucks," and "transport[ing] the product to the Gruma accounts." Appx 123–24, ¶ 24. Plaintiffs also urged that, notwithstanding the parties' selection of Texas law, New Jersey law should apply to bar arbitration based on various aspects of New Jersey public policy.

The District Court granted Defendant's motion and compelled arbitration. *Adler v. Gruma Corp.*, No. 22-cv-6598, 2023 WL 7490006, at *10 (D.N.J. Nov. 13, 2023). It did not address whether the FAA applied or evaluate Plaintiffs' exemption argument.[1] It found the parties had contracted for Texas law, under which the arbitration agreement was enforceable, and rejected Plaintiffs' bid to apply New Jersey law instead. *Id.* at *6–7. In conducting the choice-of-law analysis, the District Court focused on the parties' respective contacts with Texas and New Jersey but did not weigh the New

---

[1] In its opinion, the District Court included a footnote stating:

> Plaintiffs also argue that they should be exempt from arbitration under the FAA because they are interstate transportation workers under the exception found in 9 U.S.C. § 1. As noted above, the parties have entered into a valid arbitration agreement which contains a delegation clause; therefore, issues pertaining to arbitrability must be decided by an arbitrator.

*Adler*, 2023 WL 7490006, at *10 n.8 (citation omitted).

Jersey policies Plaintiffs urged would undermine the arbitration agreement. *Id.* at \*3–6.

Next, the District Court decided that Charles and Grant Adler, who did not sign the contract, were estopped from challenging its arbitration provision because they "acted as parties to" the contract when they performed the LLC's work. *Adler*, 2023 WL 7490006, at \*8. It then construed the arbitration provision to contain a "delegation clause," whereby the arbitrator, rather than a court, should interpret the scope of the arbitration provision. *Id.* It thus declined to determine which of Plaintiffs' claims "ar[ose] out of or relat[ed] to" the contract. *Id.*; Appx 096. Finally, the District Court dismissed the case so it could proceed to arbitration under Texas law.

Plaintiffs then filed the instant appeal.

II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367(a), and 1332(a). We have jurisdiction under 28 U.S.C. § 1291.

We review the grant of a motion to compel arbitration de novo, applying the same standard that "should have been applied" in the District Court. *Singh v. Uber Techs. Inc.* (*Sing I*), 939 F.3d 210, 217 (3d Cir. 2019). If the motion can be decided "based on the face of a complaint, and documents relied upon in the complaint," a motion-to-dismiss standard should be used; otherwise, the summary judgment standard should be applied. *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quotation marks omitted). The District Court here stated it would employ the motion-to-dismiss standard, but its opinion cites facts from the parties'

declarations submitted in connection with the motion. *Adler*, 2023 WL 7490006, at *2, *4 & n.4. We therefore will use the summary judgment standard and ask whether Defendant, as the moving party, has "show[n] that there is no genuine dispute as to any material fact and [Defendant] is entitled to" an order compelling arbitration "as a matter of law." *Guidotti*, 716 F.3d at 772 (quoting Fed. R. Civ. P. 56(a)).

We review the District Court's decision to sua sponte conclude that the contract contained a "delegation clause" for abuse of discretion. *See United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) (existence of waiver and decision to excuse waiver reviewed for abuse of discretion). The interpretation of unambiguous contractual language is reviewed de novo. *Sköld v. Galderma Lab'ys L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019).

## III.

The District Court was presented with a fairly straightforward question: whether the parties had an enforceable agreement to arbitrate and under what law. However, the answer to that question lies in the sometimes not so straightforward principles of federalism, choice of law, and contract interpretation. *See Harper*, 12 F.4th at 294.

### A. Sources of Arbitration Law

When a district court is presented with a request to enforce an agreement to arbitrate, it must determine whether that agreement is enforceable under applicable law. *Harper*, 12 F.4th at 295. Based on the principles of federalism set out in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts will enforce both federal and state arbitration law, *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 202–03 (1956), but will

8

give precedence to federal law where the two conflict, *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989). Here, the potentially applicable federal law is the FAA, whose "'principal purpose' . . . is to 'ensure that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (alterations omitted) (quoting *Volt*, 489 U.S. at 478). The FAA declares most written arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," and enacts procedures for sending parties to arbitration and staying pending litigation. *See* 9 U.S.C. §§ 2–4. But the FAA does not apply to all contracts, since it exempts, as relevant here, "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" (the "§ 1 exemption"). 9 U.S.C. § 1.

Where the request is to enforce an arbitration agreement under state law, and a question arises as to which state's law applies, the court will use the choice-of-law rules of the forum state, even where the parties have contracted for application of a particular state's law. *Harper*, 12 F.4th at 295 (citing *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017)). It may also need to consider whether the FAA preempts any state laws that would otherwise govern. If the parties' contract is within the scope of the FAA, state laws that conflict with the FAA or would "stand as an obstacle to the accomplishment of the FAA's objectives" will be preempted. *Concepcion*, 563 U.S. at 343. Thus, where the FAA would require the court to enforce the agreement, a state law that would prevent its enforcement will usually be preempted. *See Southland Corp. v. Keating*, 465 U.S. 1, 15–16 (1984) (holding preempted a California franchise statute to the extent it would preclude enforcement of

9

an agreement to arbitrate). But pro-arbitration state laws—i.e. laws that would enforce the agreement—generally remain in force. *Harper*, 12 F.4th at 293–94. And, of course, if the parties' agreement is outside the scope of the FAA altogether, the FAA will not preempt any state laws that may apply to it, including laws that may render the agreement unenforceable. *Cf. Lewis v. Cir. City Stores, Inc.*, 500 F.3d 1140, 1152 (10th Cir. 2007) ("*[W]hen the FAA applies to an arbitration agreement*, the FAA preempts conflicting state law . . . ." (emphasis added)).

Importantly, under both federal and state arbitration law, the starting place is typically the parties' agreement, and that will usually dictate whether, and under what law, arbitration should take place. *See Harper*, 12 F.4th at 294. "[P]arties are generally free to structure their arbitration agreements as they see fit," and where they "have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." *Volt*, 489 U.S. at 479. The forum state here, New Jersey, generally allows parties to choose the state's law that will govern their contracts, but choice-of-law principles may override that selection under certain circumstances. *See Arafa v. Health Express Corp.*, 233 A.3d 495, 506 (N.J. 2020) (conducting a choice-of-law analysis before deciding to apply New Jersey arbitration law as selected by the parties); *Grandvue Manor, LLC v. Cornerstone Contracting Corp.*, 272 A.3d 36, 44 (N.J. Super. Ct. App. Div. 2022) (conducting a choice-of-law analysis before enforcing parties' selection of New York arbitration law).

10

## B. When a Party Seeks Enforcement Under Either Federal or State Arbitration Law

Defendant's motion to compel arbitration urged that the District Court had authority to issue such an order under either the FAA or Texas law, both of which favor arbitration. Plaintiffs countered that the FAA did not apply, and the Court should decline to enforce the parties' selection of Texas law pursuant to New Jersey's choice-of-law rules because three New Jersey policies disfavored arbitration: (1) a policy against forum-selection clauses in franchise agreements; (2) a policy requiring arbitration provisions in employment contracts to be clear about the difference between arbitration and litigation; and (3) a policy requiring arbitration provisions in employment contracts to be clear about their coverage of statutory claims.

In *Harper*, we advised, where arbitration is sought under both the FAA and state law, and the parties contest the FAA's applicability under 9 U.S.C. § 1, district courts must follow a three-part inquiry:

> At step one, . . . a court must consider whether [the § 1 exemption applies]. . . . If that analysis leads to murky answers, a court moves to step two and assumes [the] § 1 [exemption] applies, taking the FAA out of the agreement. But the court then considers whether the contract still requires arbitration under any applicable state law. . . . If the arbitration clause is also unenforceable under state law, then the court reaches step three, and must return to federal law and decide whether § 1 applies . . . .

11

*Harper*, 12 F.4th at 296. The parties here dispute whether, under *Harper*, courts must always start with the FAA, or whether they may "jump" to independent state law to compel arbitration (i.e., *Harper*'s step two). We need not settle this issue, however. Under either reading, the District Court erred in relying on cases interpreting the FAA despite not having determined that the FAA applied. *See Adler*, 2023 WL 7490006, at *7 (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749 (Tex. 2001), as an authority on Texas arbitral law when, in fact, the case applies the FAA). Without deciding whether courts may "jump" to *Harper*'s step two, we will analyze these issues anew, beginning with the parties' dispute over whether the FAA applies. That question may be answered cleanly on the present undisputed record, and it has the potential to obviate the need for a murkier choice-of-law analysis—because, if the FAA does apply, it would require us to "'rigorously enforce' [the] arbitration agreement[] according to [its] terms," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013), and preempt any contrary New Jersey policies, *Concepcion*, 563 U.S. at 343.[2]

The District Court's opinion suggests it believed it should bypass the determination as to the applicability of the FAA because the SDDA contained a "delegation clause"—i.e., an agreement to delegate matters of arbitrability to an arbitrator. *See Adler*, 2023 WL 7490006, at *10 n.8 (declining to decide whether the FAA applied because "issues pertaining to arbitrability must be decided by an arbitrator"). But, notwithstanding the presence of a delegation clause, a court

---

[2] Since Plaintiffs concede that the relevant New Jersey policies would be preempted, *see* Reply Br. 8, we need not decide that issue.

still may not send a dispute to arbitration without first determining that there is an agreement to arbitrate that is enforceable under applicable law. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019). That is because "[a] delegation clause is merely a specialized type of arbitration agreement," which a court must evaluate in the same manner as it would "any other" arbitration agreement. *See id.* at 112 (in part quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010)). Accordingly, *New Prime* instructs that there is an "antecedent" statutory inquiry that the court should address before enforcing a delegation clause. *Id.* It addressed the question: whether the court must "leave disputes over the application of [FAA] § 1's exception for the arbitrator to resolve?" *Id.* at 108. The Court said no. *Id.* at 111. That principle is squarely implicated here.

We will thus proceed to address that issue.

IV.

The FAA applies to most written agreements to arbitrate, but exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" (the "§ 1 exemption"). 9 U.S.C. § 1. Plaintiffs contend the SDDA was such a contract.

A. Standard for the § 1 Exemption

The FAA's exemption for "any . . . class of workers engaged in . . . [interstate] commerce" is limited to "transportation workers," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118–19 (2001)—i.e., those workers who are "actively 'engaged in transportation' of . . . goods across borders," *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)

13

(quoting *Circuit City*, 532 U.S. at 121). That inquiry turns on "the actual work" such workers "typically" perform. *Id.* at 456. In assessing the nature of the employees' work, the court may look beyond individual employees to the "class" of workers, thus considering such evidentiary sources as "the contents of the parties' agreement(s), information regarding the industry in which the class of workers is engaged, information regarding the work performed by those workers, and various texts—*i.e.*, other laws, dictionaries, and documents—that discuss the parties and the work." *Singh I*, 939 F.3d at 227–28. But "[a] transportation worker need not work in the transportation industry" to fit the exemption. *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 256 (2024); *see also Brock v. Flowers Foods, Inc.*, 121 F.4th 753, 761 (10th Cir. 2024) (finding food distributors to be transportation workers). Instead, the focus is "what [the worker] does [for the employer], not what [the employer] does generally." *Saxon*, 596 U.S. at 456.

In addition, a worker whose "work is 'so closely related' to interstate commerce 'as to be in practical effect part of it'" is an interstate transportation worker, even if that worker does not personally cross state lines. *Singh v. Uber Techs., Inc.* (*Singh II*), 67 F.4th 550, 558 (3d Cir. 2023) (quoting *Singh I*, 939 F.3d at 220). What matters is whether the work "is a 'constituent part' of the interstate movement of goods or people rather than a 'part of an independent and contingent intrastate transaction.'" *Id.* (quoting *Immediato v. Postmates, Inc.*, 54 F.4th 67, 77 (1st Cir. 2022)). "[R]are engagement" with interstate commerce is not enough; instead, "interstate movement of goods or passengers [must be] a central part of the job description of the class" of workers. *Id.* at 557 (quotation marks omitted). And the exemption does not cover

"workers who engage in primarily local economic activity with only tangential interstate connections." *Id.* at 558. "Food delivery drivers, for example, can be distinguished from Amazon delivery drivers, as the former deliver food only after it has left the stream of interstate commerce. Similarly, Chicago taxi drivers provide independent local service which is not an integral part of interstate transportation." *Id.* at 558–59 (citations and quotation marks omitted) (citing *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802–03 (7th Cir. 2020); *United States v. Yellow Cab Co.*, 332 U.S. 218, 233 (1947)).

By way of illustration, in *Saxon*, the employee's primary duty was to manage other workers in the loading and unloading of cargo planes, although the employee would "frequently" move the cargo herself as well. *Saxon*, 596 U.S. at 456. The Supreme Court reasoned that, regardless of her other duties, those who "physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods." *Id.* at 457. By contrast, in *Singh*, the plaintiffs, who drove for Uber, were predominantly local, intrastate transporters. *See Singh II*, 67 F.4th at 555 (quoting the district court's finding that "2% of all rides" were interstate and "likely occur[red] due to the happenstance of geography"). These drivers' "[i]ncidental border crossings [were] insufficient" to meet the exemption given that the bulk of their work was "not typically involved with the channels of interstate commerce." *Id.* at 559. And while Uber drivers would sometimes take passengers to and from the airport, these did not count as interstate trips because there was no "single ticket that includes both flight and rideshare"; the latter was an "independent local service." *Singh*

15

*II*, 67 F.4th at 562 (in part quoting *Yellow Cab*, 332 U.S. at 232–33).

B. Application to the Present Undisputed Facts

We turn to the parties' declarations to see if the exemption "fits" based on the undisputed facts.[3] Defendant shipped tortillas and other food products from Pennsylvania into New Jersey and then tasked Plaintiffs with distributing them to Defendant's customers in Trenton and surrounding areas. To that end, Plaintiffs received Defendant's products at their New Jersey warehouse, loaded the products onto trucks, drove them to their buyers, unloaded and shelved the products, and maintained the clients' accounts. Transporting Defendant's goods constituted "[a] large component" of Plaintiffs' day-to-day work. Appx 124, ¶ 25. Defendant oversaw this work and "coordinate[d] . . . the purchase and distribution of its products" from its Texas headquarters, Appx 112, ¶ 6, and with an "Area Manager" in New Jersey, Appx 122, ¶ 14. Plaintiffs were Defendant's exclusive distributors in the territory and

---

[3] While neither the District Court nor the parties discuss this aspect, we take the parties to not dispute the facts in their declarations. The District Court cited these facts interchangeably with those in the complaint—without objection then or before us on appeal—and no party asked for discovery to controvert the other side's account. *See* Fed. R. Civ. P. 56(d) (specifying circumstances under which summary judgment may be denied for discovery). Defendant also conceded it was "not in a position . . . to dispute" Charles Adler's declaration. Tr. Oral Arg. 22:25-23:1. We thus take the facts in the parties' declarations as undisputed and examine whether they give rise to the § 1 exemption.

were prohibited from selling competing products. Thus, Plaintiffs reason, Defendant used distributors like them to move products to customers across the state line, making them "direct and necessary" to the interstate movement of goods. Appellants' Br. 21. And because Plaintiffs worked directly and exclusively for Defendant rather than as "independent" local resellers, they argue their delivery trips formed a "'constituent part' of the interstate movement of [Defendant's] goods" rather than separate "intrastate transaction[s]." *See Singh II*, 67 F.4th at 558.

Both before the District Court and on appeal, Defendant offered little substantive argument that these facts do not establish Plaintiffs as part of a class of transportation workers engaged in interstate commerce. In particular, Defendant does not dispute Plaintiffs' contention that distributors who work directly with an interstate manufacturer and move the manufacturer's goods along "the last mile of [their] interstate journeys" qualify as interstate transportation workers despite not personally crossing state lines. *See Brock*, 121 F.4th at 768 (quoting *Rittmann*, 971 F.3d at 916); *Singh II*, 67 F.4th at 558 ("Amazon delivery drivers who 'locally transport[ed] goods on the last legs of interstate journeys,' fell under [the] § 1 [exemption] because their work occurred 'within the flow of interstate commerce.'" (quoting *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 (1st Cir. 2020))).

Instead, Defendant's principal contention is that Plaintiffs did not spend a sufficient portion of their time on transportation, since their other responsibilities included "sell[ing], market[ing], and servic[ing] [Defendant's] products; servic[ing] and maintain[ing] [Defendant's] accounts; plac[ing] product orders; put[ting] the product on supermarket shelves and displays; remov[ing] stale products;

17

keep[ing] up the relationships with the accounts; and sell[ing] displays and present[ing] sale items to [Defendant's] accounts." Appellee's Br. 41. But Defendant points to no facts to controvert Plaintiffs' assertion that "a large component" of their work for Defendant "involved the transportation of goods and product." Appx 124, ¶ 25. And while Defendant's brief includes a passing reference to a need for discovery, Defendant did not seek discovery before the District Court and does not suggest what discovery it would conduct or how the results of such discovery might contradict Plaintiffs' assertion that transportation was "a large component" of their work.

Moreover, many of what Defendant calls Plaintiffs' non-transportation activities are really just the mechanics of how Plaintiffs moved products manufactured in Pennsylvania to stores in New Jersey. For example, "plac[ing] [a] product[] order[]" or "put[ting] the product on supermarket shelves" are steps in the transportation process, like loading or unloading a truck. Appellee's Br. 41. These responsibilities are not unlike those of the ramp supervisor in *Saxon* who managed and trained other ramp workers in addition to handling cargo herself. *See* 596 U.S. at 454. Accordingly, we perceive no *genuine* dispute that Plaintiffs were transportation workers engaged in interstate commerce.

Defendant also urges that, if Plaintiffs are correct that their contract was a "franchise agreement," it could not also be a "contract of employment." We disagree. In *New Prime*, the Supreme Court embraced a broad interpretation of the concept of a "contract of employment," concluding that a contract of employment for purposes of the FAA is any "agreement to perform work," regardless of whether it is for an employee or an independent contractor. 586 U.S. at 110, 114. Depending on its terms, a franchise agreement may be an agreement to

18

perform work. New Jersey's definition of a "franchise" is any "written arrangement . . . in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services." N.J. Stat. § 56:10-3. A franchisor may contract for a franchisee to "perform work" for the franchisor while using the franchisor's trademarks. *Cf. Brock*, 121 F.4th at 757, 767, 770 (finding the § 1 exemption applicable to a "direct-store-delivery" distributorship agreement that, like the one here, included terms for the protection of the seller's "professional image"); *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1182 (D. Colo. 2023) (describing the drivers as "independent distributor franchisees"). Here, clearly, the SDDA and undisputed facts show Plaintiffs contracted with Defendant to "perform work" by distributing Defendant's food products.

For these reasons, the FAA does not apply to the parties' agreement to arbitrate.

V.

Because the FAA does not apply, the remaining arbitration issues must be evaluated under state law. *Harper*, 12 F.4th at 296. That begins with the forum state and its choice-of-law rules. *Id.* at 295. New Jersey follows different choice-of-law analyses depending on whether the contract selects a specific state's law. *See Arafa*, 233 A.3d at 506.

The SDDA specified that Texas law would apply to the parties' "Agreement," and the District Court interpreted that to mean Texas law governed whether the arbitration provision of the agreement was enforceable. On appeal, Plaintiffs disagree with that contract interpretation. They urge the parties only

19

agreed that Texas law would govern their substantive obligations under the contract, not whether the arbitration provision of that contract was enforceable.[4]

As noted above, the choice-of-law provision contains two sentences: "This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. *The Federal Arbitration Act, 9 U.S.C. § 1 et seq. shall also apply as needed to uphold the validity or enforceability of the arbitration provisions of this Agreement.*" Appx 098, § 15.k (emphasis added). The first sentence by its terms applies to the entire agreement, which does include the arbitration provision. But even assuming, as Plaintiffs argue, that the first sentence standing alone does not adopt Texas law as to matters of arbitrability, the second sentence is more specific and bolsters the argument that Texas arbitration law was contemplated. Unless the words "also" and "as needed" are mere surplusage, the parties must have anticipated that Texas law was to apply to the arbitration provision, but, if necessary, the FAA would "also" apply "as needed"—specifically, "as needed to uphold the validity or enforceability of the arbitration provision[]." *Id.* So, there is a clear directive that the FAA was not intended as the sole source of arbitration law. Rather, it was intended to prevent any doubt about the validity or enforceability of the arbitration provision under Texas law. Read together, the unambiguous meaning of the provision is that Texas law shall apply to the SDDA's arbitration provision, and if needed, the

---

[4] Plaintiffs raise this specific issue for the first time on appeal, having only disputed the choice of Texas versus New Jersey law before the District Court. Nonetheless, we will address it as it involves a matter of law that is easily resolved lest it be raised again on remand.

FAA may "also apply" to uphold the enforceability of this specific provision. *Cf. Carter v. Exxon Co. USA, a Div. of Exxon Corp.*, 177 F.3d 197, 206 (3d Cir. 1999) (interpreting contract to avoid superfluity); *Grandvue Manor*, 272 A.3d at 44 (interpreting a contractual selection of New York law to govern whether an arbitration provision was enforceable).

The SDDA's language contrasts with the choice-of-law provision in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), which specified that the contract would be "governed by the law of the state of Washington . . . *except for*" the contract's arbitration provision. *Id.* at 920 (emphasis added). The Ninth Circuit read the transitional phrase "except for" to exclude Washington law on matters of arbitrability. *Id.* Here, the transitional term "also" indicates Texas law will extend even to those parts of the contract where the FAA may also play a role.

The principal precedent Plaintiffs rely on is *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995). But that case was quite unique—it had nothing to do with which state's arbitration law should be applied. Instead, it had to do with the authority of arbitrators to award punitive damages in an arbitration conducted under the FAA, where the parties had chosen New York law to govern the contract generally. *Id.* at 56. New York law permitted punitive damages to be awarded only by a court, and the issue was whether the parties' agreement to the application of New York state law generally went so far as to limit the arbitrator's remedial authority—based on a New York law that did not even outlaw punitive damages but allocated remedies to certain tribunals. *Id.* The Court, not surprisingly, said no. *Id.* at 63.

Plaintiffs cite *Oberwager v. McKechnie Ltd.*, 351 F. App'x 708 (3d Cir. 2009) (not precedential), for the proposition that an arbitration provision must evidence a "clear intent" that the chosen state's arbitration law is to apply. *See id.* at 710 (quoting *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 293 (3d Cir. 2001), *abrogated on other grounds by Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008)). But *Oberwager* and the other cases requiring "clear intent" are addressing a different issue: whether a provision selecting a particular state's law should be read as "opt[ing] out" of the FAA and replacing the FAA's procedures with state procedures. *See id.* Here, we have already decided that the FAA does not apply. And we can easily conclude that the parties agreed that Texas law should govern the arbitrability of their dispute.

Therefore, the District Court did not err in finding that the parties agreed to the application of Texas law regarding the enforceability of arbitration agreements.

VI.

Because we agree with the District Court that the parties contracted for Texas arbitration law to apply, we turn to whether the New Jersey federal court should have rejected that provision under its choice-of-law rules. As explained below, we conclude that the District Court erred in its analysis, and we will vacate its order and remand for the District Court to apply the analytical framework set out in this Opinion.

A. Enforcement of Contractual Choice-of-Law Clauses in New Jersey

"Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts

22

will uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992). But, as relevant here, the choice-of-law clause may be invalidated on policy grounds if three elements are met: (1) New Jersey has a "materially greater interest" in the "determination of the particular issue" in dispute; (2) application of Texas law conflicts with a "fundamental" New Jersey policy; and (3) New Jersey law would apply "in the absence of an effective choice of law by the parties." *Id.* (quoting Restatement (Second) of Conflict of Laws § 187(b) (1969) [hereinafter Restatement § 187(b)]). Neither party disputes the third element, namely that New Jersey law is the relevant law that would govern the arbitrability dispute absent the parties' selection of Texas, so the focus is on the first two elements: whether New Jersey has a "materially greater interest" in the arbitrability dispute and whether any relevant "fundamental" policies of New Jersey would be harmed by application of Texas law.

In moving to compel arbitration, Defendant provided a certification from its Vice President of Retail Sales detailing connections between its business and Texas. According to that declaration, Defendant maintained a headquarters in Texas, managed its business affairs there, and coordinated and paid distributors such as Plaintiffs from that location, among other activities. The District Court took these facts as true in ruling on Defendant's motion, and, lacking Plaintiffs' objection, we will do the same.

Plaintiffs responded with three New Jersey policies that, in their view, prohibited enforcement of the choice-of-law clause on the issue of arbitrability. We describe them without vouching for their correctness as statements of New Jersey law or applicability here:

23

*First*, Plaintiffs contended the parties' contract was a "franchise agreement" subject to New Jersey's Franchise Practices Act, under which a mandatory arbitration clause would be presumptively invalid. N.J. Stat. § 56:10-7.3(a)(3) ("It shall be a violation of the [Act] for a motor vehicle franchisor to require a motor vehicle franchisee to agree to a term or condition in a franchise . . . which . . . [r]equires that disputes between the motor vehicle franchisor and motor vehicle franchisee be submitted to arbitration."). Plaintiffs reasoned that the prohibition extends to all franchise agreements covered by the Act, not just motor vehicle franchises. In doing so, they relied on *Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc.*, 680 A.2d 618 (N.J. 1996), in which the Supreme Court of New Jersey concluded as much when addressing the prohibition on forum-selection clauses found in the same statutory section. *Id.* at 626. Thus, Plaintiffs argued, enforcing the SDDA's arbitration clause under Texas law would violate this New Jersey policy.

*Second*, Plaintiffs urged that New Jersey requires arbitration agreements that waive a constitutional right, like the right to a civil jury trial enshrined in the New Jersey Constitution, art. I, to contain "clear and unambiguous language that the plaintiff is waiving her right to sue or go to court to secure relief." *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 309, 315 (N.J. 2014). In Plaintiffs' view, that rule applied to the SDDA because it was effectively an employment contract, given the level of control Defendant exerted over Plaintiffs' day-to-day work. Plaintiffs interpreted the SDDA's arbitration provision as not sufficiently clear about the difference between arbitration and court proceedings.

*Third*, also related to New Jersey's requirements for the waiver of rights, Plaintiffs contended that to waive a statutory

24

right, New Jersey requires an arbitration provision to "reflect [an] employee's general understanding of the type of claims" it covers, including whether it covers "statutory claims arising out of the employment relationship or its termination." *Moon v. Breathless Inc.*, 868 F.3d 209, 214 (3d Cir. 2017) (quoting *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 773 A.2d 665, 672 (N.J. 2001)). Plaintiffs viewed the SDDA's specification of claims "relating to" the contract as ambiguous about its coverage of statutory claims. Thus Plaintiffs argued to the District Court that enforcing the arbitration clause under Texas law as to their franchise and labor law claims would violate New Jersey public policy.

## B. District Court's Reasoning

In deciding to enforce the choice-of-law clause, the District Court did not consider the policies just described in its analysis. On the "materially greater interest" prong, the District Court focused on the parties' geographic contacts with New Jersey and Texas, and determined that each state had an interest, and New Jersey had no "greater interest" in the arbitration issue. *Adler*, 2023 WL 7490006, at *5. In particular, the District Court noted Defendant's Texas activities—its headquarters, management, and distributorship operations— and reasoned these ties gave Texas "an interest in enforcing its company's rights," while Plaintiffs' geographic ties ("[t]he fact that Plaintiffs are residents of New Jersey and performed work under the SDDA in New Jersey") did not "necessarily establish that New Jersey has a materially greater interest than Texas." *Id.* And it rejected Plaintiffs' "focus[] on whether the parties' contractually chosen law violates New Jersey's public policy." *Id.* Thus, its opinion makes no mention of whether New Jersey's alleged policies against arbitrating certain types of

25

disputes might give New Jersey an "interest" that would be materially greater. *See id.* at *5–6.

The District Court relied, inter alia, on several cases from the District of New Jersey, illustrative of which is *Rosenberg v. Hotel Connections, Inc.*, No. 21-cv-4876, 2022 WL 7534445 (D.N.J. Oct. 13, 2022). That case, like this one, confronted the issue of whether a New Jersey court would enforce an arbitration agreement under a foreign state's law (as chosen by the parties) over an objection that the language failed the clarity requirement of New Jersey's *Atalese* decision. 2022 WL 7534445 at *3. The *Rosenberg* court, with little analysis, concluded New Jersey lacked a "materially greater interest" due to the fact that: (1) the parties had agreed to apply New York law, (2) the defendant "service[d] clients in New York," and, (3) "[m]ost importantly," the defendant "was incorporated in New York at the time of the execution of the" agreement. *Id.* at *5. Based on the reasoning of this case and similar precedents, the District Court here found Defendant's Texas connections significant enough to require the application of Texas law. *See Adler*, 2023 WL 7490006, at *5.

The District Court alternatively concluded that, even if New Jersey did have a materially greater interest, compelling arbitration would not conflict with a fundamental New Jersey policy. But the District Court evaluated only one potential New Jersey policy and not the three Plaintiffs had offered. The District Court viewed the policy question as whether Plaintiffs could "assert[] any [New Jersey] statutory claims" in an arbitral forum. *Adler*, 2023 WL 7490006, at *6. Since they concededly could, the District Court reasoned arbitration was no obstacle to New Jersey's fundamental policies. *Id.* The District Court did not consider whether, as Plaintiffs claimed,

26

New Jersey had expressed policies against arbitration itself in franchise or employment contracts.

## C. Parties' Arguments on Appeal

Plaintiffs object to the District Court's reasoning on both prongs. On the materially greater interest prong, Plaintiffs argue the District Court "engaged in an unduly narrow analysis of the states' respective interests by focusing solely on the parties' contacts with New Jersey and Texas." Appellants' Br. 28. In Plaintiffs' view, the "policy reasons underlying the state's conflicting laws" may count as an "interest," thereby giving New Jersey a "materially greater interest" despite Defendant's presence in Texas. *Id.* at 37 (quoting *Homa v. Am. Express Co.*, 558 F.3d 225, 232 (3d Cir. 2009), *abrogated on other grounds by Concepcion*, 563 U.S. 333). On the fundamental policy prong, Plaintiffs fault the District Court for considering only whether Plaintiffs could vindicate their substantive rights in an arbitral forum, rather than the three public policies Plaintiffs had offered.

Defendant mostly does not disagree with Plaintiffs on the law. In particular, Defendant does not challenge Plaintiff's assertion that a state's policies may count as an "interest" favoring application of that state's law under the "materially greater interest" prong. Thus, if, as Plaintiffs say, New Jersey has a policy against arbitration clauses in contracts like the SDDA, Defendant has not claimed a court should ignore that policy in weighing New Jersey's interests under the first prong. And Defendant also does not contest Plaintiffs' characterization that the District Court's opinion failed to mention the three policies Plaintiffs had advocated. *See* Appellee's Br. 20 (recounting the factors the District Court relied on).

27

Defendant urges, however, that the District Court's reasoning should be upheld because the policy interests, even if relevant, are "not enough" to overcome the parties' agreement to use Texas law. Appellee's Br. 23 (quoting *SKF USA Inc. v. Okkerse*, 992 F. Supp. 2d 432, 441 (E.D. Pa. 2014)). Thus, Defendant insists, because the District Court evaluated the myriad contacts with Defendant's Texas operations, its conclusion that New Jersey lacked a "materially greater interest" should be affirmed. *Id.* at 20. Defendant also endorses the District Court's reasoning that arbitration would not conflict with a fundamental New Jersey policy because Plaintiffs may still bring their state-law claims in an arbitral forum.

### D. New Jersey Contractual Choice-of-Law Rules Require Consideration of Both Policies and Geographic Ties

We conclude the District Court's omission of consideration of New Jersey's alleged policies regarding arbitration undermines its conclusion as to both aspects of the choice-of-law analysis, and will offer guideposts for its consideration of these issues on remand.

### 1. "Materially Greater Interest"

We begin with the "materially greater interest" prong. To determine which state has a "materially greater interest" in the application of its law to the issue in question, New Jersey's choice-of-law rules ask for more than counting contacts: they call for an examination into whether New Jersey has expressed a "policy interest" in enforcing the protections of its own law regarding an issue over a contrary agreement by the parties. *See Instructional Sys.*, 614 A.2d at 134–35. *Instructional*

28

*Systems* is illustrative of this approach. The plaintiff there was a New Jersey-based distributor of a software system sold by the defendant, a California-based Delaware corporation, and their contract selected the law of California to govern their affairs. *Id.* at 126, 130. When the defendant sought to terminate the distributorship, a dispute arose as to whether the plaintiff could obtain the protection of New Jersey's Franchise Practices Act despite the contractual selection of California law. *Id.* at 133. Applying the test from Restatement § 187(b) set out above, the New Jersey Supreme Court looked to the fact that "New Jersey has a strong policy in favor of protecting its franchisees." *Id.* at 135. It also noted New Jersey's "significant 'contacts' with the transaction," including that the plaintiff was "located" in New Jersey, its employees resided there, and it had made "franchise-specific investments" there such as its "assets" and "the goodwill developed for [the defendant] by New Jersey residents." *Id.* Looking more broadly, the Court observed that the "protection [of the Franchise Practices Act] may not be waived." *Id.* at 134. Yet, if the choice-of-law clause were enforced, "any large franchisor . . . could with a stroke of a pen remove the beneficial effect of the franchisee's state's remedial legislation" just by "insert[ing] . . . a choice of law provision requiring the application of the franchisor's home state's law." *Id.* at 134–35 (quotation marks omitted). Based on these considerations (and while deeming it a "close question"), the *Instructional Systems* court declined to enforce the choice-of-law clause. *Id.* at 134.

We followed a similar approach in *Homa*, 558 F.3d 225, *abrogated on other grounds by Concepcion*, 563 U.S. 333. The question there was whether New Jersey would apply its policy against certain class-action waivers (which, at the time, was thought not to conflict with the FAA) despite the parties'

29

selection of Utah law. *Id.* at 227. Following the test from Restatement § 187(b), we "'identif[ied] the governmental policies underlying the law of each state and how those policies [were] affected by each state's contacts to the litigation and to the parties' so that we c[ould] determine which state ha[d] the greater interest in resolving the issue of the class-arbitration waiver's validity." *Id.* at 232 (nested quotation marks omitted) (quoting *Gantes v. Kason Corp.*, 679 A.2d 106, 109 (N.J. 1996), *abrogated by McCarrell v. Hoffmann-La Roche, Inc.*, 153 A.3d 207 (N.J. 2017)). The New Jersey policy in question existed to allow "consumers[] . . . to effectively pursue their statutory rights under New Jersey's consumer protection laws," whereas the contrary Utah policy served to "honor[] freedom-of-contract principles and . . . protect Utah banks from unwarranted class-action suits." *Id.* (alterations omitted). We then looked at the parties' contacts with Utah and New Jersey. On the Utah side, the defendant was a Utah bank, but it was a "wholly owned subsidiary of . . . a New York corporation" and the plaintiff would mail his payments to Florida. *Id.* On the New Jersey side, the plaintiff resided there, his claims were based on New Jersey's Consumer Fraud Act, and New Jersey had an "interest in protecting its consumers' ability to enforce their rights under" that statute. *Id.* We found the last two contacts most significant, and thus "predict[ed] that the Supreme Court of New Jersey would determine that New Jersey has a materially greater interest than Utah in the enforceability of a class-arbitration waiver that could operate to preclude a New Jersey consumer from relief under the [New Jersey Consumer Fraud Act]." *Id.* at 232–33. Thus *Homa*, like *Instructional Systems*, considered the in-state contracting parties' "ability to enforce their rights under" New Jersey law to be an "interest" weighing in favor of New Jersey having a "materially greater interest." *Id.*

Defendant contends that reliance on *Homa* is "misplaced" because the New Jersey policy at issue there—a restriction on certain class-action waivers in consumer contracts—was later held preempted by the FAA in *Concepcion*, 563 U.S. 333. Appellee's Br. at 24 n.9. But since we have determined the FAA does not apply in this case, preemption is not an issue. *Lewis*, 500 F.3d at 1152 ("*[W]hen the FAA applies to an arbitration agreement*, the FAA preempts conflicting state law . . . ." (emphasis added)). We do recognize that *Homa* relied, in part, on *Gantes*, 679 A.2d 106, whose specific holding (concerning statutes of limitations) has been overruled. *See McCarrell*, 153 A.3d at 210. However, we do not believe the overruling of *Gantes* affects the continued validity of the approach taken in *Homa*—at least insofar as that approach requires consideration of New Jersey policy interests regarding the specific issue presented in a contractual choice-of-law analysis. *Homa* looked to *Gantes* only to give content to the phrase "materially greater interest," which Restatement § 187(b) does not define, by analogy to New Jersey's "governmental-interest" test as then articulated by *Gantes*. *Homa*, 558 F.3d at 232. While New Jersey no longer uses the governmental-interest test for choosing statutes of limitations, *see McCarrell*, 153 A.3d at 210, this change is unrelated to *Homa*'s conclusion that a state policy preference counts as an "interest" in deciding which state has a "materially greater interest."

For these reasons, it was incorrect for the District Court to reject Plaintiffs' "focus[] on whether the parties' contractually chosen law violates New Jersey's public policy" regarding arbitration, *Adler*, 2023 WL 7490006, at *5, as that indeed should have been considered as part of the "materially greater interest" analysis. If Plaintiffs were correct that the

31

SDDA was a franchise agreement and its arbitration provision violated a statute designed to "protect[] [New Jersey] franchisees," an argument could follow that New Jersey would not allow contracting parties to remove those protections merely "by providing in their agreement that the laws of another state will govern." *Instructional Sys.*, 614 A.2d at 135; *cf. also* Restatement § 187, cmt. g ("[A] fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power."). That is not to say the outcome would necessarily be that New Jersey had the greater interest, *see Instructional Sys.*, 614 A.2d at 134 (calling the question "close"), but it does show that narrowing the focus to the parties' geographic ties, and not focusing on the nature of the specific issue (i.e., arbitration), missed the real question: whether New Jersey courts would insist on subjecting an interstate contract to certain requirements of New Jersey law regarding arbitration designed for the protection of the in-state contracting parties despite an agreement to use a different state's law, *see id.* at 135.

As noted, Defendant does not disagree that New Jersey's policies were relevant, instead merely contending they were "not enough" to tip the balance on the materially greater interest prong. Appellee Br. 23 (quoting *SKF*, 992 F. Supp. 2d at 441). Defendant quotes *SKF* for the proposition that "[i]t is not enough to assert that [one state] has a greater interest simply because application of [the other state's] law runs contrary to a fundamental . . . policy [of the first state]." 992 F. Supp. 2d at 441. To the extent that statement simply means that the "materially greater interest" prong won't turn exclusively on the policy aspect, we do not disagree. *See* Restatement § 187, cmt. g ("The forum will not refrain from applying the

32

chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law."). Certainly both the geographic ties and the states' policies regarding the issue in question are important considerations, and it could be said that the stronger a litigant's ties to New Jersey, the more likely New Jersey is to extend the protection of its fundamental policies. *See id.* But the connection between New Jersey and the arbitration dispute here was not so remote as to obviate the need for an analysis into whether the parties' contacts and the strength of New Jersey's policies were such as to give New Jersey the "materially greater interest" in the arbitration issue.

## 2. "Fundamental Policy"

We also agree with Plaintiffs that the District Court erred in its analysis of the "fundamental policy" prong of Restatement § 187(b), because the District Court disregarded the three New Jersey policies Plaintiffs had offered and considered only whether arbitration would "preclude Plaintiffs from asserting any statutory claims under New Jersey law." *Adler*, 2023 WL 7490006, at *6. If the question is whether enforcement of Texas law would "violate New Jersey's public policy," *Instructional Sys.*, 614 A.2d at 133, the nature of the policy itself and its relative importance must be considered. And the New Jersey Supreme Court has held that a choice of forum will sometimes violate public policy even where that forum is capable of "faithfully and fairly apply[ing]" New Jersey law and "afford[ing] identical relief" to that available in a New Jersey court. *Kubis*, 680 A.2d at 628. Therefore, Plaintiffs' alleged policies needed to be evaluated to determine whether they were correct statements of New Jersey law, whether they applied on the facts of this case (i.e., whether the SDDA was a franchise agreement, whether its arbitration

33

clause was unclear, etc.), and whether those policies were sufficiently "fundamental" to justify setting aside the parties' selection of Texas law. *See* Restatement § 187, cmt. g.

＊ ＊ ＊

For these reasons, the District Court erred in its reasoning on choice of law. While the issue presents a legal question that could potentially be decided on appeal, *Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008), we think the better course is to remand for the District Court to reconsider its analysis in light of our discussion. We will therefore vacate the District Court's order and remand for it to complete the choice-of-law analysis under the framework discussed above.

VII.

We briefly address two remaining issues Plaintiffs raise on appeal: (1) whether the District Court erred in its sua sponte reading of a "delegation clause" in the contract; and (2) whether the individual, non-signatory Plaintiffs are bound to arbitrate.

A. Delegation Clause

When Defendant moved to compel arbitration, it asserted that all of Plaintiffs' claims were within the scope of the arbitration provision. Plaintiffs responded that their statutory claims were outside the scope of the provision because they did not relate to the SDDA. But the District Court did not decide that issue. Instead, it pointed to a provision it interpreted as a "delegation clause," which would "have the arbitrator decide whether a given claim must be arbitrated." *Adler*, 2023 WL 7490006, at *8. So it did not rule on whether

34

Plaintiffs' statutory claims were within the scope of the arbitration provision.

Plaintiffs argue that by "brief[ing] the merits of [Plaintiffs'] challenge to the enforceability of the arbitration provision and ask[ing] *the court* to enforce the agreement over that challenge," Defendant "waived any right it had under the SDDA to have enforceability issues decided by an arbitrator." Appellants' Br. 47–48. We disagree.

Plaintiffs do not challenge the correctness of the District Court's reading of the SDDA, but assert that somehow Defendant's failure to raise the delegation clause constitutes waiver of the provision. While a party can waive a contractual right to arbitrate, *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 340 (3d Cir. 2023), this rule does not speak to the propriety of a court's interpreting contractual language for itself. Instead, the "waiver" cases Plaintiffs rely on involved, at most, litigants changing positions: first asking a court to decide an issue, then reversing course and demanding to arbitrate. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 415 (2022); *United States ex rel Dorsa v. Miraca Life Scis., Inc.*, 33 F.4th 352, 357 (6th Cir. 2022); *Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1325 (11th Cir. 2016); *In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1295 (11th Cir. 2014). They are of limited value here.

Courts are permitted to disagree with litigants on matters of law, *In re Mintze*, 434 F.3d 222, 228 (3d Cir. 2006), which, in Texas, would include the interpretation of unambiguous contracts, *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We see no reason to depart from that practice in a court's consideration of a delegation clause in an arbitration agreement.

It is true courts should normally respect "the principle of party presentation" by declining to "consider . . . on [their] own initiative" defenses not raised by the parties, *Wood v. Milyard*, 566 U.S. 463, 472 (2012), instead confining their analysis to "only those issues argued by interested and motivated litigants," *Dowdell*, 70 F.4th at 145. But that principle is not "absolute," *Wood*, 566 U.S. at 473, and we do not believe it was violated here. The District Court was presented with contractual language and asked to interpret it, which led it to the conclusion that an arbitrator was to decide matters of arbitrability. We find no abuse of discretion.[5]

## B. Estoppel

Finally, the individual Plaintiffs (Charles and Grant Adler) point out that they did not sign the contract and thus never agreed to arbitrate. These Plaintiffs object to the District Court's determination that they were bound under an estoppel theory.[6]

---

[5] We note Defendant's brief does not offer much in the way of support for the District Court's exercise of discretion. Nevertheless, it is Plaintiffs, as the parties seeking reversal, who must persuade us there was an *abuse* of that discretion, and Plaintiffs have not done so. *See Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 148 (3d Cir. 2013) ("To demonstrate an abuse of discretion, an appellant must show that the District Court's decision was arbitrary, fanciful or clearly unreasonable." (alterations omitted)).

[6] Before the District Court, Plaintiffs offered only a cursory opposition to Defendant's estoppel argument. However, the District Court addressed estoppel on the merits, and, on appeal,

Normally, arbitration under Texas law is a matter of consent: no agreement to arbitrate, no arbitration. *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021).[7] But "under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005). Thus "a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes." *Id.* at 739. That can happen if the non-signatory plaintiff's "claims are 'based on a contract' containing an agreement to arbitrate." *Id.* at 740. "For example, if a non-signatory's breach-of-warranty and breach-of-contract claims are based on certain terms of a written contract, then the non-signatory cannot avoid an arbitration provision within that contract." *Id.*

Defendant does not contend Plaintiffs forfeited the issue (except as to Plaintiffs' reliance on *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022)). Accordingly, we will address estoppel on the merits as well.

[7] The District Court applied Texas law to decide whether the individual Plaintiffs were bound to the contract. While there was a possible circularity to this reasoning (since presumably, if the individual Plaintiffs were not bound to the contract, they were also not bound to its choice-of-law clause), we need not decide whether it was correct, since Plaintiffs never argued for application of a different state's estoppel law. We also do not address whether, on remand, a revised choice-of-law analysis might affect the estoppel issue as well. *See Erny v. Est. of Merola*, 792 A.2d 1208, 1213 (N.J. 2002) ("Ordinarily, choice-of-law determinations are made on an issue-by-issue basis, with each issue receiving separate analysis.").

at 739. A non-signatory may also be bound if it "consistently and knowingly insist[ed] that others treat it as a party to the contract during the life of the contract." *ENGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269, 275 (Tex. Ct. App. 2014).[8]

However, we do not believe the District Court's analysis was adequate to justify binding the individual Plaintiffs to a contract they did not sign. Its reasoning consisted mainly of noting the prominence of the SDDA in Plaintiffs' allegations regarding their work for Defendant. *See Adler*, 2023 WL 7490006, at *8. But "a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue." *Kellogg*, 166 S.W.3d at 740. In *Kellogg*, for example, a second-tier subcontractor was not bound by an arbitration clause in the first-tier subcontract, despite having been hired to supply parts for that contract, because it was not

---

[8] We agree with Defendant that *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), did not undermine the foregoing articulation of Texas estoppel law, and in any event Plaintiffs did not make that argument to the District Court and have therefore forfeited it. *See Hickey v. Univ. of Pittsburgh*, 77 F.4th 184, 191 n.5 (3d Cir. 2023) (arguments raised for the first time on appeal are forfeited). While *Morgan* clarified the FAA is not a font of "special, arbitration-preferring procedural rules," 596 U.S. at 418, Texas courts had long recognized that "the presumption [favoring arbitration] arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists," and thus refused to apply a pro-arbitration bent to their estoppel inquiry, *Kellogg*, 166 S.W.3d at 737. Accordingly, the authority cited by the District Court did not conflict with *Morgan*.

38

"seek[ing], through the claim, to derive a direct benefit from the contract containing the arbitration provision." *Id.* at 741. Here, the individual Plaintiffs' claims were based on multiple theories, including federal and state labor laws and New Jersey's Franchise Practices Act. The District Court needed to consider not solely whether the individual Plaintiffs performed work called for by the LLC's contract, but whether their claims "s[ought] the benefits of" it, *id.* at 739, as opposed to the benefits of "obligations imposed by state law, including statutes, torts and other common law duties, or federal law," *ENGlobal*, 449 S.W.3d at 275. We also question the District Court's conclusion that "the individual Plaintiffs acted as parties to the SDDA" merely by working for the LLC on business called for by the SDDA. *See Adler*, 2023 WL 7490006, at *8. Employees of a business are not necessarily parties to all of the business's contracts. *See* SDDA § 7, Appx 084 (providing for the LLC to hire non-signatory employees).

Moreover, Texas law contemplates a claim-by-claim estoppel determination rather than wholesale application to an entire lawsuit. *See Kellog*, 166 S.W.3d at 741 (analyzing separate claims separately). Some of Defendant's estoppel arguments were specific to certain of Plaintiffs' claims. For example, Defendant argued Plaintiffs' Franchise Practices Act claim inherently sought the benefits of the SDDA because a franchise must involve a "written arrangement." N.J. Stat. § 56:10-3. That argument may not extend (or might apply differently) to Plaintiffs' labor law claims. Similarly, Defendant's argument that Plaintiffs' claim for breach of the covenant of good faith and fair dealing was in reality a contract claim based on the SDDA would not extend to Plaintiffs' claims asserting violations of statutes.

The District Court also suggested that the estoppel inquiry could be delegated to an arbitrator because it "relates to the parties' agreement as a whole, not specifically to the parties' agreement to arbitrate." *Adler*, 2023 WL 7490006, at *8. While that statement was harmless (as the District Court proceeded to conduct the analysis itself rather than delegate it), it was incorrect. If the individual Plaintiffs were not bound to the arbitration provision, they were necessarily not bound to its delegation clause. *See Aerotek*, 624 S.W.3d at 204 (arbitration is a matter of "consent"); *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) (requiring a court to decide if a contract is in effect before enforcing it).

We will not perform the estoppel analysis on appeal since it may become moot if the outcome on choice-of-law results in there being no arbitration. On remand, the District Court should consider the estoppel analysis to the extent it is relevant.

VIII.

Accordingly, we will vacate the order compelling arbitration and remand for the District Court to complete the choice-of-law analysis under the correct framework, as well as evaluate, if necessary, whether the non-signatory Plaintiffs are bound to the contract.